957 A.2d 125

**ARONSON & COMPANY**

v.

**Ellen FETRIDGE et al., Co–Personal Representatives of the Estate of Keith R. Fetridge.**

**No. 00741 Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Sept. 12, 2008.

652

**654**

Craig D. Singer (Howard W. Gutman, George A. Borden, M. Jesse Carlson, Williams & Connolly, LLP, on the brief), Washington, DC, for Appellant.

Steven P. Hollman (Robert B. Wolinsky, Rebecca C. Mandel, Hogan & Hartson, LLP, on the brief), Washington, DC, for Appellee.

Panel: KRAUSER, C.J., ZARNOCH, and ADKINS,* JJ.

ADKINS, Judge.

In this case we are asked to examine, for the first time, the applicability of the Maryland Wage Payment and Collection Law to a claim against his former firm by a Certified Public Accountant who had been not only an employee, but a shareholder, president, and managing officer of the firm. Keith Fetridge ("Fetridge") was involuntarily terminated by his employer, Aronson & Company ("Aronson"), appellant, in November 2001. Aronson appeals a judgment awarding Fetridge's Estate ("the Estate") $3,072,031.29 in treble damages for Aronson's breach of an Employment Agreement and violation of the Maryland Wage Payment and Collection Law ("the Wage Law"), Md. Code (1999 Repl. Vol., 2006 Cum. Supp.), § 3–501 *et seq.* of the Labor and Employment Article (LE).[1]

The Estate's claims are based on Aronson's failure to pay Fetridge Terminating Employee Compensation ("TEC") under the terms of the Employment Agreement. In Aronson's appeal, it presents the following six questions for our review:

I. Whether termination payments are recoverable under the Wage Law when they are expressly conditioned upon a contractual covenant not to compete.

---

* Sally D. Adkins, now serving on the Court of Appeals, participated in the hearing and conference of this case while an active member of this Court; she participated in the adoption of this opinion as a specially assigned member of this Court.

1. The award for breach of the Employment Agreement was $1,024,010.43. That amount was trebled to reach the $3,072,031.29 award.

II. Whether payments calculated based on a portion of a firm's overall profits, and not based on the employee's own efforts, are "wages" under § 3–501 of the Wage Law.

III. Whether payments contractually required to be made only in the event of an employee's termination are recoverable under a statute that requires payment "on or before the day on which the employee would have been paid ... if the employment had not been terminated." (Emphasis omitted.)

IV. Whether a "bona fide dispute" existed between Aronson and the Estate regarding Fetridge's violation of the covenant not to compete when Aronson understood, and had every reason to believe, that Fetridge (a) associated with a competitor firm, (b) lured substantial business away from Aronson to that competitor firm, and (c) abandoned any claim for the TEC.

V. Whether the Estate's failure to provide access to Fetridge's books and records breached a condition precedent under the contract to Aronson's payment of Terminating Employee Compensation, when the contract expressly conditions payment on such access, and when the unmistakable purpose of the contractual books and records requirement is to permit Aronson to determine whether, and in what amount, it may owe TEC.

VI. Whether a judgment may be entered retroactive to the date of verdict, thus dramatically increasing the amount of post-judgment interest, when the delay in entering judgment is attributable not to clerical error but to the court's conscious decision.

In a cross-appeal, the Estate presents the following question for our review:

Whether the trial court abused its discretion in eliminating the jury's award of interest where the contract mandated the payment of accrued interest at a specified amount, and the trial court and Aronson's counsel agreed that the man-

ner of computing that interest was set forth in the contract and that the calculation was "arithmetical."

We conclude that the court did not err with respect to any of the issues raised in Aronson's appeal. It erred only with respect to the Estate's cross-appeal.[2]

## FACTS AND LEGAL PROCEEDINGS

Keith Fetridge was a Certified Public Accountant who practiced for approximately twenty-five years at Aronson, an accounting firm in which he eventually became a shareholder, president, and managing officer. This appeal arises out of the end of Fetridge's association with Aronson in November 2001, and his death on January 2, 2004. Fetridge's Estate brought an action against Aronson for breach of contract and violation of the Wage Act to recover a sum exceeding $1 million dollars that Fetridge was purportedly owed pursuant to the terms of a written Employment Agreement ("Employment Agreement") executed on June 1, 1997.

The Employment Agreement provided that Fetridge would be entitled to receive TEC as defined in Section 9(a) of the Agreement upon his involuntary termination from Aronson. Section 9(a) defined TEC as follows:

> Pursuant to this Agreement, whenever [Fetridge] shall be entitled to receive "Terminating Employee Compensation," he ... shall be entitled to receive payment of an amount equal to [his] Deferred Compensation Account (as defined in Section 9(b) and paid pursuant to Section 9(c), below) which shall be subject to setoff rights contained in Section 10 hereof.

Section 9(b) of the Agreement specified how Fetridge's Deferred Compensation Account was determined:

---

2. The Estate filed a motion to correct the record on April 8, 2008, in which it requests that we include in the record on appeal the transcript from an April 18, 2006 hearing before the trial court, addressing the Estate's fee petition. We grant the motion.

[Fetridge's] Deferred Compensation Account shall be determined by [Aronson] annually as of May 31 of each year, and shall be communicated to [Fetridge] no later than September 30 of such year. [Fetridge's] Deferred Compensation Account as of the beginning of each fiscal year of [Aronson] shall be reduced by any cash distributions made to [Fetridge] during the course of such fiscal year of [Fetridge]. Amounts accrued by [Aronson] during the course of any fiscal year shall not be posted to [Fetridge's] Deferred Compensation Account prior to the end of such fiscal year. The amount in [Fetridge's] Deferred Compensation Account shall be determined [by Aronson's Board of Directors].

Section 9(c) of the Agreement stated that Aronson, upon termination, would be paid the amount in his Deferred Compensation Account "in twelve (12) equal quarterly installments with interest" that would accrue at the "applicable federal rate at the date of termination of employment for instruments with a three (3) year term plus two percent (2%) per annum." The quarterly payments would begin on the first day of the fourth month following Fetridge's termination and continue until the Deferred Compensation Payment Account was paid in full.

Under Section 10(a) of the Employment Agreement, Fetridge agreed to a covenant not to compete, specifying that for a period of three years after his termination, he "shall not provide essentially the same services to [Aronson's] client(s) . . . as those being provided by [Aronson] or for which [Aronson] had billed or for which [Aronson] had work in process, during the twelve-month period immediately preceding [Fetridge's] departure." Fetridge would only be deemed to have violated the covenant not to compete if he received compensation for competing services equal to or in excess of $25,000. The Employment Agreement stated:

[Fetridge] acknowledges that the calculation required [to determine the amount of compensation received for competing services] will require that [Aronson] be given access to [Fetridge's] or [Fetridge's] employer's books and records. [Fetridge] agrees that failure to provide for such access, for any reason, shall be grounds for [Aronson] refusing to make

any additional payment of Terminating Employee Compensation to [Fetridge].

In the event that Fetridge violated the covenant in the three years after leaving the firm, Fetridge was required in Section 10(c) to pay to Aronson an amount equal to thirty percent of his or his new employer's fee collections from Aronson's former clients. Section 10(d) of the Employment Agreement then provided that Aronson "shall have the right to offset against [TEC] payments it owe[d] pursuant to Section 9(c) any amounts owed by [Fetridge] pursuant to this Section 10[,]" the covenant not to compete.

Aronson's board of directors terminated Fetridge's employment on November 7, 2001. The termination, effective on November 9, 2001, was involuntary. At the time of his termination by Aronson, Fetridge had $1,024,010.43 in his Deferred Compensation Account. Under Section 9(c) of the Agreement, the first quarterly TEC installment date was March 1, 2002, and the last quarterly installment date was on December 1, 2004. Aronson did not make any of the quarterly installment payments to Fetridge during his life or to the Estate after his death on January 2, 2004.

After he was terminated from Aronson, Fetridge established Keith R. Fetridge, CPA, LLC, a single member limited liability company with Fetridge as the only member. According to an attorney who helped Fetridge establish the LLC, Fetridge structured his employment relationships so as to not violate the prohibitions contained in his Employment Agreement. Approximately two weeks after his termination, Fetridge contacted Robert Offterdinger, the managing partner of Beers & Cutler (B & C), a public accounting firm. According to Offterdinger, Fetridge indicated that he was no longer with Aronson and was looking to continue to do some consulting work for some of his former clients. Fetridge described his obligations under the covenant to not compete and eventually entered into a Co–Location and Support Agreement ("Co–Location Agreement") with B & C. The preamble of the Co–Location Agreement indicated that the LLC "is engaged in

the business of providing businesses and financial consulting services to clients" and that "B & C is a full service accounting, tax and consulting firm[.]" The Co–Location Agreement then provided that B & C would provide the following services to the LLC:

(a) Make available for LLC's use an office within B & C's Washington, D.C. offices.

(b) Provide LLC with secretarial support.

(c) Provide LLC with general office services, such as telephone, facsimile, photocopying, courier and the like.

(d) Provide LLC with time recording and billing support.

In return, the LLC would pay B & C $997.00 in rent. The Co–Location Agreement also stated that "[n]othing contained herein shall create a relationship of employer-employee, principal-agent or any partnership, joint venture or other engagement between LLC or any LLC employee (including Fetridge) and B & C." Under a provision entitled "Common Clients[,]" the Co–Location Agreement provided:

LLC and B & C may from time to time be separately retained to provide services to the same client. In so doing, LLC may gain access to B & C's Confidential Information, and B & C may gain access to LLC's Confidential Information. Accordingly, the parties have agreed to the provisions [of the Article addressing confidentiality] to protect their respective interests.

Offterdinger testified that B & C never paid any salary to Fetridge and never obtained any services from Fetridge for any of its clients. He stated that the LLC did not actually pay the rent that was due under the agreement. Fetridge's failure to pay, according to Offterdinger, was due to his not being pleased with the services that he had received from the assistant furnished by B & C.

During a period spanning from mid-December 2001 to early February 2002, Aronson received twenty-two authorization letters from Aronson clients notifying Aronson that they had selected B & C as their accounting firm. Three of these letters mentioned Fetridge's name. Aronson also introduced

an exhibit listing the income B & C received from former Aronson clients from 2002 to the time of trial in 2006. The total income received was over $4.5 million. Offterdinger indicated that he knew Fetridge introduced twelve of the thirty-three listed former Aronson clients to B & C.

Believing that B & C intended to employ Fetridge, Aronson wrote a letter to Offterdinger on December 13, 2001, informing Offterdinger of Fetridge's obligations under the covenant not to compete. Offterdinger did not respond to the letter because B & C did not intend to employ Fetridge in the manner expressed in Aronson's letter. Offterdinger acknowledged, however, that B & C "knew that there was a possibility and probability that we would be introduced to some" of the clients Fetridge had managed at Aronson.

S. Lang Hinson, one of the Estate's personal representatives and a long-time Aronson client while Fetridge was employed there, testified that he met with Fetridge at approximately the same time that Fetridge discussed his co-location and support arrangement with B & C. According to Hinson, Fetridge asked Hinson at this meeting to consider taking his work to B & C. Shortly thereafter Hinson did so. Hinson indicated that Fetridge provided him with some consulting services, but that to his knowledge, Fetridge was not involved in any of the accounting services provided by B & C. Hinson acknowledged, however, that Fetridge competed "to some extent with Aronson" following his termination. Hinson indicated that he did not know the magnitude of Fetridge's competition with Aronson, but knew that the LLC had billed as much as $200,000 for services to former Aronson clients. Hinson said that he did not know what those services were.

Lisa Cines, Aronson's managing partner, testified that after Fetridge was given notice of his termination on November 9, 2001, Aronson intended to honor the terms of Fetridge's employment contract, but that there would be "appropriate discussions over a period of time to work out details." Attorneys for Aronson and Fetridge exchanged letters on a variety of issues, and in one letter, dated November 21, 2001, Fet-

ridge's counsel indicated that "the amount of the deferred compensation" continued to be a matter requiring attention. Aronson's counsel wrote a letter in response five days later stating that Aronson had informed Fetridge of the amount of his deferred compensation in previous correspondence. Aronson and Fetridge did not have any further communication on the issue.

Cines testified that Aronson determined the date when Fetridge would be due his first quarterly payment, but "believed that there was going to be an invoke, an entitlement to offsets." Cines agreed that Aronson had been advised by counsel that the first TEC payment would be due February 1st or March 1st of 2002 and that was her operating assumption at the time.

After Fetridge's death on January 2, 2004, Hinson began investigating a claim against Aronson regarding the TEC. Hinson met with Aronson representatives who indicated that Aronson was unwilling to pay a claim for TEC. According to Hinson, he was unaware of any Aronson request for Fetridge's or the LLC's books or records, or that Fetridge ever refused Aronson access to his books or records prior to the lawsuit. On November 24, 2004, the Estate filed suit for breach of contract and violation of the Wage Law, seeking treble damages and attorney fees.

After the Estate brought suit, Aronson issued a subpoena duces tecum to Fetridge, LLC, requiring the LLC to designate a witness and demanding production of records. The Estate sought a protective order to limit production to certain documents. Hinson testified that his understanding was that "at some point after the subpoena was received, the records of the LLC [had] been provided as appropriate." Aronson resorted to obtaining some documents, however, by subpoenas issued to third parties.

A six day trial was held in the Circuit Court for Montgomery County beginning March 6, 2006. At trial, the Estate sought to establish its entitlement to the TEC, and sought interest on Fetridge's deferred compensation, as called for in Section 9(c) of the Employment Agreement. When the Estate

sought to put forward expert testimony concerning the rate and calculation of interest, the court concluded that expert testimony was unnecessary, agreeing with Aronson's counsel that the calculation was "arithmetical" and the Employment Agreement was detailed in setting forth how the jury should go about calculating interest.

The jury returned a verdict in favor of the Estate on March 13, 2006, for $1,302,820.07 on the breach of contract count and $3,908,460.21 on the Wage Law count. The amount awarded for Aronson's violation of the Wage Law represents the jury's treble damages award for its finding that there was an absence of "a bona fide dispute between the parties as to any payment of terminating employee compensation that may have been due" to Fetridge. The court stayed entry of the judgment against Aronson on March 20, 2006, pending resolution of the Estate's request for attorney fees.

Aronson then moved for judgment notwithstanding the verdict and for a new trial, or, in the alternative, for remittitur. The court heard argument on the motions and took them under advisement on June 30, 2006. On February 23, 2007, the court issued a memorandum opinion denying Aronson's motions for JNOV and for a new trial, concluding that 1) the TEC was subject to the Wage Law, 2) the jury was entitled to find that there was no "bona fide dispute" between Aronson and Fetridge that justified withholding payment, and 3) the Estate had produced evidence from which the jury could find that Aronson had breached the employment contract. The court granted remittitur, however, due to "the minimal evidence presented to the jury on the issue of interest, and the significant possibility that the jury accepted statements made by [the Estate's] counsel in closing argument as evidence[.]" The court reduced Aronson's base damages amount to $1,024,010.43 and the corresponding treble damages amount to $3,072.031.29. The Estate accepted the reduced verdict on March 22, 2007.

The Estate sought an order, while Aronson's post-trial motions were still pending, directing the clerk to enter judgment, *nunc pro tunc,* to the date of the verdict, and the court

granted that motion on May 2, 2007, back dating the remitted judgment to March 13, 2006. Aronson filed its notice of appeal on May 16, 2007, and the Estate cross-appealed on May 22, 2007.

## DISCUSSION

### *Standard Of Review*

Judgment notwithstanding the verdict (JNOV) is proper "when the evidence, at the close of the case, taken in the light most favorable to the nonmoving party, does not legally support the nonmoving party's claim or defense." *Kleban v. Eghrari–Sabet*, 174 Md.App. 60, 85, 920 A.2d 606 (2007). In reviewing a motion for JNOV, we "resolve all conflicts in the evidence in favor of the plaintiff and must assume the truth of all evidence and inferences as may naturally and legitimately be deduced therefrom which tend to support the plaintiff's right to recover." *Smith v. Bernfeld*, 226 Md. 400, 405, 174 A.2d 53 (1961). We are to uphold the court's denial of a JNOV " '[i]f there is any evidence, no matter how slight, legally sufficient to generate a jury question[.]' " *See CIGNA Prop. and Cas. Companies v. Zeitler*, 126 Md.App. 444, 488, 730 A.2d 248 (1999). "The denial of a motion for JNOV is in error, however, '[i]f the evidence ... does not rise above speculation, hypothesis, and conjecture, and does not lead to the jury's conclusion with reasonable certainty[.]' " *See Nationwide Mut. Ins. Co. v. Anderson*, 160 Md.App. 348, 356, 864 A.2d 201 (2004), *cert. denied*, 386 Md. 181, 872 A.2d 46 (2005) (citation omitted). We may reverse the trial court's judgment, moreover, if its denial of the motion was " 'legally flawed.' " *See id.*

### *Aronson's Appeal*

### Aronson's Liability Under The Wage Law

### I.

### The Covenant Not To Compete

"Maryland's Wage Payment Act protects employees from wrongful withholding of wages by employers upon termi-

nation." *Stevenson v. Branch Banking & Trust Corp.*, 159 Md.App. 620, 635, 861 A.2d 735 (2004). LE section 3–505 provides that "[e]ach employer shall pay an employee or the authorized representative of an employee all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." Under LE section 3–507.1, an employee has a private right of action to recover unpaid wages: "[I]f an employer fails to pay an employee in accordance with ... § 3–505 of this subtitle, after 2 weeks have elapsed from the date on which the employer is required to have paid the wages, the employee may bring an action against the employer to recover the unpaid wages."

The Wage Law, in LE section 3–501(c)(1), defines the term "[w]age" to mean "all compensation that is due to an employee for employment." LE section 3–501(c)(2) adds that the term "[w]age includes: (i) a bonus; (ii) a commission; (iii) a fringe benefit; or (iv) any other remuneration promised for service." In *Medex v. McCabe*, 372 Md. 28, 36, 811 A.2d 297 (2002), the Court of Appeals indicated that "it is the exchange of remuneration for the employee's work that is crucial to the determination that compensation constitutes a wage. Where the payments are dependent upon conditions other than the employee's efforts, they lie outside of the definition." (Citation omitted.)

Aronson argues that Fetridge's TEC cannot be recovered under the Wage Law because the contract conditions payment on Fetridge's compliance with the covenant not to compete. Aronson contends, citing *Stevenson*, 159 Md.App. at 645–47, 861 A.2d 735, that a payment conditioned on a covenant not to compete is not recoverable under the Wage Law, regardless of whether the employee actually violated the covenant not to compete. Aronson insists that Fetridge's termination compensation, like the compensation in *Stevenson*, is explicitly a *quid pro quo* for Fetridge's compliance with the covenant not to compete and is, therefore, not a wage "due for work ...

performed before the termination of [Fetridge's] employment" and not eligible for the Wage Law's remedies. *See id.*

In *Stevenson*, we considered whether an employee could recover termination compensation under the Wage Law when the employment contract contained a provision stating, "if Employee breaches [the non-compete provisions in] section 4(a) of this Agreement during the period that [s]he is receiving Termination Compensation, Employee will not be entitled to receive any further Termination Compensation[.]" *See id.* We concluded that the provision conditioned the employee's termination compensation on compliance with a covenant not to compete in a manner that removed the remuneration from the scope of the Wage Law. *See id.* The termination compensation was not recoverable under the Wage Law because it did not qualify as a wage due for work performed before the termination of employment. It was, instead, "explicitly a *quid pro quo*" for the employee's promise to refrain from competing with the employer. *See id.*

Aronson asserts that Fetridge's employment contract is like the one in *Stevenson* because it provides that Fetridge's Terminating Employee Compensation "shall be subject to the setoff rights contained in Section 10 hereof." Aronson argues that Fetridge's covenant not to compete for three years and Aronson's setoff right to 30% of Fetridge's fees earned from Aronson's former clients constitutes a post-termination condition on the Terminating Employee Compensation which takes the payments outside of the Wage Law. We disagree.

■ Aronson's "right to offset against [TEC] payments it owes" for Fetridge's violation of the Covenant Not to Compete is of a different nature than the condition on the termination compensation in *Stevenson*. Fetridge's right to receive TEC was not conditioned on his compliance with the covenant not to compete. We agree with the Estate's characterization of the Employment Agreement, that it "sets forth Aronson's independent obligation to pay Terminating Employee Compensation, the right to which vests upon termination, while simultaneously creating an arrangement under which Mr. Fetridge

would have been obligated to compensate Aronson had he earned more than $25,000 by offering 'essentially the same services' to former Aronson clients."

 Black's Law Dictionary defines "setoff" as "[a] debtor's right to reduce the amount of a debt by any sum the creditor owes the debtor." BLACK'S LAW DICTIONARY 1404 (8th ed. 2004). "The right of setoff (also called "offset") allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Maryland v. Strumpf,* 516 U.S. 16, 18, 116 S.Ct. 286, 289, 133 L.Ed.2d 258 (1995) (citation omitted).

The "right to offset" in the Employment Agreement operates like the conventional setoff. It merely established Aronson's right to reduce the amount of termination compensation owed to Fetridge by the amount Fetridge owed Aronson for his compensation received from former Aronson clients in violation of the covenant not to compete. It did not condition Fetridge's right to termination in the "if then" fashion as in *Stevenson.* Unlike the *Stevenson* covenant, which dis-entitled the employee from "any further Termination Compensation" for a violation of the covenant not to compete, Fetridge was entitled to continue receiving the TEC, even if he violated the covenant not compete. His payments would merely be subject to a practical mechanism through which the parties could resolve their independent debt obligations. The TEC was, accordingly, not a disqualifying *quid pro* quo for a promise to refrain from competing with Aronson, but was, instead, a wage due for work performed before the termination of employment, subject to Aronson's right to collect what it was independently owed under Section 10 of the Employment Agreement.

## II.

### The Payments' Inclusion Of Profits

Aronson asserts that termination compensation payments at issue were not "wages" because they constituted a share of

Aronson's profits. Aronson argues that the TEC did not qualify as "wage" under Section 3–501(c) of the Wage Law, because Fetridge's TEC consisted entirely of Fetridge's Deferred Compensation Account, and the Deferred Compensation Account represented the allocation of Aronson's profits to its officers from the prior fiscal year. According to Aronson, the Wage Law's definition of "wage" under LE § 3–501 does not encompass a business's allocation of its profits. Profits, Aronson insists, are not remuneration under the statute, because they are not directly tied to an employee's efforts, but dependant on factors other than the employee's efforts. *See Medex*, 372 Md. at 36, 811 A.2d 297 (payments which "are dependent upon conditions other than the employee's efforts . . . lie outside the definition" of a wage).[3]

Aronson contends that, although structured as a Maryland professional corporation, it functioned as a partnership, and that its Deferred Compensation Accounts were functionally identical to partnership capital accounts. In support of its position, Aronson points to expert testimony indicating that Aronson's board would allocate the firm's profits to the Deferred Compensation Accounts of its officers based on a number of factors, including the number of hours billed on matters supervised by the officer, and the officer's management and administration of the firm. It also emphasizes that the deferred compensation payments were tied to the firm's profits and points to testimony that (1) a discretionary portion (15%) was determined by the board with no set criteria, and (2) the amount of the Deferred Compensation Account would be affected by profits and losses.

---

**3.** Aronson also cites cases from other jurisdictions in which courts interpreted similar wage payment statutes to exclude profit-sharing arrangements from the statutory definition of wage. *See, e.g., Truelove v. Ne. Capital & Advisory, Inc.*, 95 N.Y.2d 220, 715 N.Y.S.2d 366, 738 N.E.2d 770, 772 (2000)(excluding from statutory definition of a wage "certain forms of 'incentive compensation' that are more in the nature of a profit-sharing arrangement and are both contingent and dependent, at least in part, on the financial success of the business enterprise" and the discretion of the employer).

In *Whiting–Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 783 A.2d 667 (2001), the Court of Appeals considered whether a bonus, in the form of profit-sharing, qualified as a "wage" under LE section 3–501(c). The Court, first, synthesized what employers are required to pay terminated employees under LE section 3–501(c):

[W]hat is due an employee who terminates employment with an employer are wages for work performed before termination, or all compensation due to the employee as a result of employment including any remuneration, other than salary, that is promised in exchange for the employee's work. Subsection (c)(1) provides the definition of "wage," while subsection (c)(2) gives examples of the compensation, other than periodic salary, that the definition encompasses. Read together, the wages which an employee is due, and which must be paid on termination of employment, consist of all compensation, and any other remuneration, that the employee was promised in exchange for his work. In other words, ... *to be wages, "to be included within the statute, the payment must have been promised to the employee as compensation for work performed."*

*Id.* at 303, 783 A.2d 667 (emphasis added).

The Court then addressed whether the *Whiting–Turner* employee's profit-sharing payment, qualified as a wage under the Wage Law, given that it was not a part of the compensation promised to the employee. The Court concluded that the profit-sharing bonus at issue was not a wage, as it was merely a gift, but that it would have been a wage had it been offered for the employee's fulfillment of the terms in the employee's compensation package:

When the petitioner hired the respondent, the parties agreed on a salary and, after two years of employment and depending on the profitability of the company, *profit sharing. Had the respondent been with the petitioner for two years when the decision was made to offer him a bonus and had the financial condition of the petitioner justified it, there would be no doubt of the respondent's entitlement, that he would have earned the distribution in this*

*case. That is so because sharing in the profits of the company after two years was promised as part of the respondent's compensation package.* Here, however, the petitioner decided to give the respondent a bonus before he had been employed for two years. Where such remuneration is not a part of the compensation package promised, it is merely a gift, a gratuity, revocable at any time before delivery.

*Id.* at 305–06, 783 A.2d 667 (emphasis added).

■ *Whiting–Turner,* therefore, instructs that payments comprising a business' profits can, as a matter of law, constitute a wage under LE section 3–501, as long as they are "promised as compensation for work performed." *See id.* at 303–06, 783 A.2d 667. The *Medex* Court, in stating that payments which "are dependent upon conditions other than the employee's efforts ... lie outside of the definition" of a wage, merely explains its holding in *Whiting–Turner,* that payments, which are merely offered as a gratuity, revocable at any time before delivery, and not promised for service, do not qualify as wages under the Wage Law. *See Medex,* 372 Md. at 36–37, 811 A.2d 297. The *Medex* Court does not require that each dollar received be tied to specific actions by the employee.

■ The jury was entitled to conclude that Fetridge's TEC, unlike the profit-sharing payment in *Whiting–Turner,* was "promised as compensation for work performed" from the terms of his Employment Agreement and Aronson's tax treatment of the payments. Recital B of the agreement states that "[b]oth Employer and Employee desire that Employee remain in the employ of Employer in the aforesaid capacity." In consideration of this, Aronson promised Fetridge, *inter alia,* to pay TEC as called for in Section 8(c) upon his involuntary termination. Fetridge's entitlement to the compensation, therefore, merely required his continued employment with Aronson, followed by his involuntary termination. The jury could conclude from these terms that Aronson was promised termination compensation for his employment, and that he

fulfilled the terms of the Employment Agreement when he remained an Aronson employee until his involuntary termination on November 9, 2001.

The Estate also introduced W–2 wage and tax statements and tax returns, and took testimony from Aronson's internal accounting manager and others, indicating that Aronson reported the Deferred Compensation Account and TEC payments as wages. The Estate's expert, Bruce Dubinsky, testified about the significance of recording a payment of terminating employee compensation as a wage: payments recorded as wages are tax deductible. To qualify for the deduction, federal regulations require that payments be purely for services. Aronson's tax treatment of these payments as wages provided additional relevant evidence from which the jury could conclude that these payments were promised in exchange for Fetridge's services.

## III.

### The Plain Language Of The Wage Law

Aronson argues that the Fetridge's TEC is not recoverable under the plain language of LE § 3–505, because it would not have been due "if the employment had not been terminated." LE § 3–505 provides that "[e]ach employer shall pay an employee or the authorized representative of an employee all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." Aronson insists that the fundamental principles of statutory interpretation require us to read the final clause in LE § 3–505, stating that an employer must pay an employee as "if the employment had not been terminated" as necessarily excluding payments that arise from termination. According to Aronson, a contrary interpretation would render that clause superfluous and nugatory.

Our decision in *Stevenson*, 159 Md.App. at 644, 861 A.2d 735 quickly disposes of this claim. In *Stevenson*, we rejected an argument "that severance pay falls outside the scope of the

[Wage Law] because it does not compensate employees for work performed before termination[:]"

> Given the broad language of the statute and its remedial purpose, we conclude that the scope of Maryland's Wage Payment Act extends to the type of severance pay that represents deferred compensation for work performed during the employment. Thus, a severance benefit that is based on the length and/or nature of the employee's service, and promised upon termination, may be recoverable under the Wage Payment Act.

*Id.* at 644, 861 A.2d 735. We found persuasive the observation in *Botany Mills, Inc. v. Textile Workers Union of Am.,* 50 N.J.Super. 18, 141 A.2d 107, 113 (1958) that severance pay "has often been said to be in the nature of deferred compensation, in lieu of wages, earned in part each week the employee works, and payable at some later time." *See Stevenson,* 159 Md.App. at 644, 861 A.2d 735 (emphasis omitted).

Although we focused our analysis in *Stevenson* on the first clause of LE section 3–505, *i.e.* whether severance pay qualified as "wages due for work that the employee performed before the termination of employment," we necessarily concluded that the second clause of LE section 3–505 did not disqualify severance pay from the Wage Law's coverage. *See id.* at 635–42, 861 A.2d 735. The second clause in LE section 3–505, stating that wages are to be paid "on or before the day on which the employee would have been paid wages if the employment had not been terminated[,]" does not define the type of remuneration subject to the Wage Law. This is addressed in the first clause of LE section 3–505 and in section 3–501, which provides what a "wage" includes in the subtitle.

▆ The second clause in LE section 3–505 instead simply instructs employers as to when they are to pay "wages due" upon termination, which is when such remuneration was regularly paid according to the terms of employment. *See Friolo v. Frankel,* 373 Md. 501, 513, 819 A.2d 354 (2003)(stating that "[t]he focus of [section 3–505 of the Wage Law] is [ ] on . . .

the duty to pay whatever wages are due on a regular basis and to pay all that is due following termination of the employment.") Severance pay, a form of deferred compensation for work performed during the employment, is regularly owed upon an employee's termination. We are to "consider the meaning of the statutory language in the context of the overall statutory scheme[,]" *see Whiting–Turner,* 366 Md. at 302, 783 A.2d 667, when endeavoring to "apply the statute in the manner designed by the legislature." *See Stevenson,* 159 Md.App. at 637, 861 A.2d 735. Were we to read the second clause of LE section 3–505 in isolation, as Aronson suggests, and conclude from it that termination compensation cannot qualify because it could not be due "if the employment had not been terminated[,]" we would indulge an interpretation that undermines the Wage Law's remedial purpose to ensure that employees are paid " 'all that is due following termination of the employment.' " *See id.* at 635–44, 861 A.2d 735 (citing *Friolo,* 373 Md. at 513, 819 A.2d 354). Section 3–505, therefore, required Aronson to pay Fetridge what he was regularly due under the terms of the Employment Agreement. This included TEC according to Section 9(c), which states that he would be paid "twelve (12) equal quarterly installments" with the first installment being paid "on the first day of the fourth (4th) month after [his] termination of employment."

## IV.

## The Treble Damages And Attorney's Fees

Aronson challenges the awards of treble damages and attorney's fees, claiming that the evidence presented at trial established conclusively that a "bona fide dispute" existed regarding whether and to what extent Aronson owed Fetridge TEC. Aronson perceives the "bona fide dispute" to revolve around Fetridge's apparent breach of his non-compete obligation. Aronson asserts that there was no evidence that Aronson consciously refused to pay any amount it admittedly owed, and that Aronson had a good faith basis for withholding payment

on its belief that Aronson had moved to B & C and taken a number of clients with him.

Under LE section 3–507.1, a court may award an employee "an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs" if it finds "that an employer withheld the wage of an employee in violation of the [the Wage Law] and not as a result of a bona fide dispute[.]" "What constitutes a 'bona fide dispute' … depends on the circumstances." *Admiral Mortg., Inc. v. Cooper*, 357 Md. 533, 541, 745 A.2d 1026 (2000). The Court of Appeals in *Cooper* elaborated on the nature and definition of a "bona fide dispute[:]"

> All of the definitions articulated by the courts focus really on whether the party making or resisting the claim has a good faith basis for doing so, whether there is a legitimate dispute over the validity of the claim or the amount that is owing. The issue is not whether a party acted fraudulently; fraud is certainly inconsistent with the notion of "bona fide" or "good faith," but it is not required to establish an absence of good faith. The question, simply, is whether there was sufficient evidence adduced to permit a trier of fact to determine that [the employer] did not act in good faith when it refused to pay commissions to [the employee] on the five loans that closed after he terminated his employment.

*Id.* at 543, 745 A.2d 1026. The question of whether there existed a "bona fide dispute" under LE section 3–507.1 is "not one of law to be decided summarily, but rather properly reserved for resolution by the jury." *See Medex*, 372 Md. at 44, 811 A.2d 297. The determination of discretionary damages, moreover, is " 'quintessentially a matter for the for the trier of fact[.]' " *See id.* (citation omitted). The jury is, therefore, tasked with the responsibility of making "the determination of a bona fide dispute and award of treble damages[.]" *See id.*

Aronson argues that the evidence at trial compels the conclusion that a bona fide dispute existed. It contends first, from Cines' testimony and November 16, 2001 correspondence

from Aronson's counsel informing Fetridge of the balance in his Deferred Compensation Account, that Aronson clearly intended to pay Fetridge TEC. Aronson then asserts that the following testimony and evidence shows that it appeared to Aronson that Fetridge had become employed by B & C, a competing accounting firm, had lured away many clients, and had, therefore, violated the covenant not to compete:

- Aronson received twenty-two authorization letters from Aronson clients, during a period spanning from mid-December to early February 2002, notifying Aronson that they had selected B & C as their accounting firm, and that three of these letters mentioned Fetridge's name;

- Aronson, believing that B & C intended to employ Fetridge, wrote a letter to Robert Offterdinger, the B & C managing partner, on December 13, 2001, in which it informed Offterdinger of Fetridge's obligations under the covenant not to compete, and then never received a response to the letter;

- Cines, Aronson's managing partner, testified that Aronson determined the date that Fetridge would be due his first quarterly payment, but "believed that there was going to be an invoke, an entitlement to offsets[;]"

- Aronson introduced an exhibit listing the income B & C received from former Aronson clients from 2002 to the time of trial and that the total income received was over $4.5 million;

- Offterdinger testified that Fetridge entered into an arrangement with B & C approximately two weeks after his termination, in which the firm agreed to provide Fetridge with office space and administrative support and that there was "a possibility and probability" that the firm would be introduced to some of Aronson's clients; and

- Hinson, the Estate's personal representative, testified that Fetridge "competed to some extent with Aronson" following his termination.

Aronson contends, in light of the above, that it was unaware of the specific terms of Fetridge's arrangement with B & C,

and neither Fetridge nor Offterdinger ever sought to dispel Aronson's belief that Fetridge had been hired by a competing firm. Aronson maintains, therefore, that it was entitled to judgment notwithstanding the verdict with regard to the award of treble damages and attorney's fees, due to the evidence conclusively showing that there existed a bona fide dispute.

The question before us is whether there was sufficient evidence adduced to permit the jury to determine that Aronson did not have a "good faith basis" for refusing to pay Fetridge TEC. *See Cooper*, 357 Md. at 543, 745 A.2d 1026. We conclude that there was. For Aronson to exercise its "right to offset against payments it owes" in Section 10 of the Employment Agreement, it needed a basis from which it could conclude that Fetridge was in violation of the Covenant Not to Compete, *and* that the firm was owed more for that breach than Fetridge was owed by the firm. *See* Employment Agreement, section 10(d). Aronson must have information from which it could reasonably conclude the following:

- Fetridge was providing "essentially the same services to [Aronson's] client(s) . . . as those being provided by [Aronson] or for which [Aronson] had billed or for which [Aronson] had work in progress, during the twelve-month period immediately preceding [Fetridge's] departure[;]"

- Fetridge's income "for such competing services, in the aggregate, [was] equal to or in excess of Twenty–Five Thousand Dollars ($25,000)[;]" and

- The excess over $25,000 was greater than the amount owed by Aronson to Fetridge for TEC at the time such Compensation was due.

In other words, because the Court of Appeals has required that the jury decide the issue of whether there was a "bona fide dispute," *see Cooper*, 357 Md. at 543, 745 A.2d 1026, it was up to the jury to determine whether, at the times the quarterly payments of TEC were due to Fetridge, Aronson had a reasonable basis to believe that Fetridge owed more to Aronson for violating the non-compete covenant than Aronson owed

to Fetridge for TEC. Our review of the record reveals that there was sufficient evidence to support the jury's determination that Aronson did not.

There was evidence at trial indicating that at the time Fetridge's TEC first became due on March 1, 2002, Aronson made little, if any, effort to determine whether and to what extent Fetridge was in violation of the Covenant Not to Compete. According to Hinson, the Estate's personal representative, Aronson did not request access to Fetridge's books or records until *after* the Estate filed its lawsuit. Without Fetridge's books or records, Aronson lacked a basis from which it could determine whether Fetridge had received compensation equal to or in excess of $25,000, for "competing services[.]" There is little, if any, indication, moreover, that Aronson inquired as to whether Fetridge provided "essentially the same services" to former Aronson clients that were provided by Aronson in the twelve months prior to Fetridge's termination.

Section 10(b) states that "[e]mployee acknowledges that the [Covenant Not to Compete] calculation required by this Section 10(b) and Section 10(c) *will require* that Employer be given access to Employee's or Employee's employer's books and records." (Emphasis added.) This language supports the inference that the parties contemplated that Aronson's right to offset could not be based on mere speculation, without verification, of Fetridge's violation of the terms of the Covenant Not to Compete. In this light, Aronson's mere belief "that there was going to be an invoke, an entitlement to offsets[,]" without any inquiry, is simply an assumption which entitled the jury to conclude that Aronson lacked a "legitimate dispute over the ... amount that is owing" when it failed to pay Fetridge his quarterly payments of TEC. *See Cooper*, 357 Md. at 543, 745 A.2d 1026.

To be sure, when Aronson received the letters from its clients, there was reason to suspect that Fetridge was instrumental in motivating the twenty-two clients to move from

Aronson to B & C. The Employment Agreement, however, did not prohibit Fetridge from referring clients to a third party.

We are not ruling out constructive receipt of payments as a basis for liability when the covenantor affiliates itself with a third party competitor and the terms of the affiliation or benefits received by the covenantor supports that theory. But that was not what the jury found here. Moreover, the only evidence that Fetridge received money from B & C was his failure to pay the stipulated rent payment of $997 per month for his office and the support services he was supposed to receive. The managing partner of B & C denied paying any compensation to Fetridge, and said that the reason Fetridge failed to pay the $997 per month was because Fetridge was not pleased with the services he received from the assistant furnished by B & C. The jury was free to believe this witness, and conclude that Fetridge received none of the fees that former Aronson clients paid to B & C. More important-ly, the jury could reasonably determine that, at the times that Aronson refused to pay Fetridge, it had no information about Fetridge's receipt of any portion of the fees paid to B & C by former Aronson clients.[4]

We will assume, without deciding, that the jury, on this evidence, *could* have found that Aronson had a bona fide dispute about the amount owed to Fetridge for his TEC. We are unwilling to rule, however, that the trial court was re-quired to remove this issue from the jury's consideration, when Aronson chose to withhold all TEC payments without making any effort to determine that Fetridge actually owed Aronson more money that Aronson owed him.

### Conclusion

In sum, the contractually set prerequisite for allowing Aron-son to withhold Fetridge's wages (TEC payments), was that

---

**4.** We do not suggest that it was unreasonable for Aronson to infer that its former clients paid an amount to B & C similar to that they had paid to Aronson each year for accounting and tax services, but that informa-tion did not mean that Fetridge received all or some of those fees.

Fetridge breached the Employment Agreement by "provid[ing] essentially the same services to [Aronson's] client(s) . . . as those being provided by [Aronson] or for which [Aronson] had work in process, during the twelve-month period immediately preceding [Fetridge's] departure," and "receive compensation greater than $25,000 for those competing services." Employment Agreement, section 10. The evidence was sufficient for the jury to reasonably conclude that Aronson did *not* have sufficient information, at the time the TEC payments were due to Fetridge, to reasonably believe that (1) Fetridge was an employee of B & C, or (2) that he received the compensation paid by former Aronson clients to B & C, or the equivalent thereof, and Fetridge owed Aronson, because of this competition, more than Aronson owed Fetridge.[5] Such a finding would justify the jury's conclusion that Aronson lacked a "bona fide dispute" that would justify its withholding of Fetridge's wages.

### Aronson's Other Issues On Appeal

### V.

### The Estate's Failure To Produce Fetridge's Books And Records

Aronson asserts that the Estate's failure to produce Fetridge's books and records pursuant to Section 10(b) of the Employment Agreement was a material breach of a condition precedent that excused Aronson's performance. Section 10(b) provides:

> Employee acknowledges that the calculation required by this Section 10(b) and Section 10(c) will require that Employer be given access to Employee's or Employee's employer's books and records. *Employee agrees that failure to provide for such access, for any reason, shall be grounds for Employer refusing to make any additional payment of*

---

5. We do not address Aronson's challenge to the circuit court's alternate legal basis for its ruling because our ruling here renders that issue moot.

*Terminating Employee Compensation to Employee.* (Emphasis added.)

Aronson asserts that the Estate failed to provide access to Fetridge's books and records when it objected to Aronson's subpoena *duces tecum* and then sought a protective order in September 2005. As a result, Aronson had to obtain Fetridge's and Fetridge LLC's bank records by issuing a subpoena to Bank of America. Aronson insists that the Estate, by actively seeking to prevent Aronson from accessing relevant Fetridge LLC and Bank of America documents, including large checks paid to the Estate, inhibited Aronson's ability to calculate the compensation Fetridge received for his services provided to former Aronson clients. Citing *Chirichella v. Erwin,* 270 Md. 178, 182, 310 A.2d 555 (1973), Aronson argues that the Estate's provision of access to Fetridge's books and records was a condition precedent, or a "fact ... which ... must exist or occur before a duty of immediate performance of promise arises[,]" and that the Estate's failure to provide access during discovery negated Aronson's duty to perform.

In determining whether Section 10(b) created a condition precedent, we examine the language of the contract. *See Richard F. Kline, Inc. v. Shook Excavating & Hauling, Inc.,* 165 Md.App. 262, 273, 885 A.2d 381 (2005), *cert. denied,* 391 Md. 115, 892 A.2d 478 (2006). "The interpretation of a contract is a question of law and subject to *de novo* review." *Doyle v. Finance America, LLC,* 173 Md.App. 370, 376, 918 A.2d 1266 (2007). "A fundamental principle of contract construction is to ascertain and effectuate the intention of the contracting parties." *B & P Enterprises v. Overland Equip. Co.,* 133 Md.App. 583, 604, 758 A.2d 1026 (2000). "Because Maryland follows the 'objective' law of contracts, the court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated." *Id.* "Where the language of the contract is unambiguous, its plain meaning will be given effect. There is

no need for further construction." *Aetna Cas. & Sur. Co. v. Ins. Comm'r,* 293 Md. 409, 420, 445 A.2d 14 (1982).

■ In *Chirichella,* the Court of Appeals provided the following definition of a condition precedent:

A condition precedent has been defined as 'a fact, other than mere lapse of time, which, unless excused, must exist or occur before a duty of immediate performance of a promise arises[.]' ... The question whether a stipulation in a contract constitutes a condition precedent is one of construction dependent on the intent of the parties to be gathered from the words they have employed and, in case of ambiguity, after resort to the other permissible aids to interpretation[.] Although no particular form of words is necessary in order to create an express condition, such words and phrases as 'if' and 'provided that,' are commonly used to indicate that performance has expressly been made conditional, as have the words 'when,' 'after,' 'as soon as,' or 'subject to[.]'

*See id.* (citations omitted). "[W]hen a condition precedent is unsatisfied, the corresponding contractual duty of the party whose performance was conditioned on it does not arise." *Overland Equip. Co.,* 133 Md.App. at 606–07, 758 A.2d 1026.

■ The Estate's purported failure to provide access to Fetridge's books and records during discovery did not constitute a violation of a condition precedent negating Aronson's duty to perform. Section 10(b) of the Employment Agreement states that Fetridge's "failure to provide for such access ... shall be grounds for [Aronson] refusing to make any *additional* payment of Terminating Employee Compensation." (Emphasis added.) This provision is unambiguous and permits Aronson to withhold TEC payments *due in the future* when Aronson has requested, but has been refused, access to Fetridge's books and records. Aronson's access to the records was not, however, a condition which had to exist before Aronson's duty of immediate performance arose with respect to payments which were *past due.*

There is no indication in the record that Aronson ever requested access to Fetridge's (or the LLC's) books and

records during the period in which Fetridge was entitled to receive payments, from March 1, 2002 to December 1, 2004. Aronson was, therefore, already obligated to pay all of the past due TEC payments when the Estate allegedly failed to provide access to the LLC's records during discovery in 2005. Aronson's argument on this point is a nonstarter.

## VI.

### The Court's Retroactive Entry Of Post–Judgment Interest

Aronson asserts that the court erred when it entered judgment *nunc pro tunc* to the date of verdict. According to Aronson, the court's decision to back-date the judgment to the date of the verdict, nearly fourteen months earlier, resulted in it being charged over $300,000 in post-judgment interest at the statutory rate of 10%. Aronson argues that this decision to back-date the judgment is legally erroneous, because a *nunc pro tunc* entry can only be employed to amend the record when there has been some clerical error. The court erred, according to Aronson, because its *nunc pro tunc* entry was based on a conscious decision to stay entry of the judgment pending a determination on the amount of attorney's fees, and not to correct a clerical error.

In support of its position, Aronson cites *In re Timothy C.*, 376 Md. 414, 429–30 n. 10, 829 A.2d 1024 (2003), in which the Court of Appeals cited with approval our statement in *Prince George's Co. v. Commonwealth Land Title*, 47 Md.App. 380, 386, 423 A.2d 270 (1980) that " 'the purpose of a *nunc pro tunc* entry is to correct a clerical error or omission as opposed to a judicial error or omission.' " *Id.* The Court explained, further, that a court's *nunc pro tunc* power

[t]o make the record speak the truth and conform to the facts is a common law power, and is incident to all courts of record, and essential to their efficient existence.... But in the exercise of such power the Court is authorized to make only such corrections as will make the record conform to the actual facts occurring in the progress of the cause, or, in

other words, make the Record speak the truth. It cannot so change the Record as to make it inconsistent with the facts, or make it state what is not true.

*Id.* (citation omitted).

We do not agree that the court's directions regarding the running of judgment interest was a prohibited *nunc pro tunc* order, and we are guided by our recent decision in *Mona v. Mona Elec. Group, Inc.,* 176 Md.App. 672, 730–31, 934 A.2d 450 (2007). In *Mona,* the trial court granted a judgment notwithstanding the verdict (JNOV), and entered a revised judgment some time after the original verdict, with a reduced amount of damages. The defendant paid the judgment, including judgment interest dating from the revised verdict, not the date of the jury verdict. The plaintiff refused to file an order of satisfaction, claiming he was owed post-judgment interest on the revised amount of judgment from the date of the original jury verdict, and the trial court agreed. On appeal, the defendant argued that "when the trial court granted its JNOV motion, it eliminated the prior judgment and, accordingly, postjudgment interest only accrued from the date the revised judgment was entered, and not from the date of the original judgment entered on the verdict." Judge Deborah Eyler, writing for this Court, explained:

> The Court of Appeals has been clear that **when determining the date of entry of judgment for the purposes of calculating postjudgment interest, we must evaluate the circumstances on a case-by-case basis, keeping the objective of the postjudgment interest rules in mind.** *[Med. Mut. Liab. Ins. Soc'y of Md. v.] Davis,* 365 Md.[477, 484, 781 A.2d 781](stating "[Md.] **Rule 2–604(b) must be applied to various situations in accordance with the purpose of post-judgment interest . . . .").** The Court of Appeals has explained the purpose of postjudgment interest statutory provisions as follows:
>
>> The purpose of post-judgment interest is obviously to compensate the successful suitor for the same loss of the use of the monies represented by the judgment in its

favor, and the loss of income thereon, between the time of the entry of the judgment ...—when there is a judicial determination of the monies owed it—and the satisfaction of the judgment by payment.

*Id.* at 730, 934 A.2d 450 (some citations omitted, emphasis added).

We concluded in *Mona* that since the trial court only granted the JNOV in order to exclude a *portion* of the damages, the balance of the jury verdict remained intact, and the trial court acted properly in dating judgment interest from the date of the original verdict and judgment. *Id.* at 730–31, 934 A.2d 450. We have exactly that situation here. As in *Mona*, the trial court was correct in determining that interest should run from the date of the jury verdict, because "the jury verdict remained essentially intact." *Id.* at 730, 934 A.2d 450. Indeed, the trial court's reason for staying the judgment was to consider *adding* to the judgment an award of attorneys' fees, which it ultimately did.

As this court explained in *Brown v. Med. Mut. Liab. Ins. Soc'y of Md.*, 90 Md.App. 18, 30, 599 A.2d 1201, *cert. denied*, 326 Md. 366, 605 A.2d 101 (1992),

[Defendant's] argument that because this case, on the merits, presented difficult legal issues that took years for appellate resolution, requiring post-judgment interest from the date of the original judgment on the verdict "furthers no legitimate judicial interest," is simply wrong. This argument ignores the principal purpose of post-judgment interest, *i.e.*, to compensate a successful plaintiff for the "loss of monies represented by a judgment in its favor, and the loss of income thereon, between the time of entry of judgment ... and the satisfaction of judgment by payment." *I.W. Berman Properties v. Porter Bros., Inc.*, 276 Md. 1, 24, 344 A.2d 65 (1975).

■■■■ We recognize that this case differs from *Mona* in that when the jury returned its verdict on March 13, 2006, the verdict was not recorded on the docket, and no judgment was entered. The record also reflects that on March 20, 2006, the

court issued a directive from the bench staying the entry of final judgment pending resolution of the Estate's request for attorneys' fees pursuant to the Employment Agreement. The March 20, 2006 record reflects the following dialogue between the trial court and the clerk:

[The Court]: All right. What are we doing in the Fetridge matter?

[The Clerk]: We're just staying the order of final judgment pending the outcome of the hearing.

[The Court]: Oh, that's correct. There is an issue in that case. The parties are not present. There is an issue in that case regarding attorney's fees, which has yet to be decided. We will stay the entry of final judgment pending the resolution of that issue.

The clerk made no docket entry for March 13 or March 20, 2006. Thus, *Mona* is distinguishable because in *Mona* a judgment was originally entered, and later voided by JNOV and a revised judgment entered. But we consider that distinction immaterial. Md. Rule 2–601 directs that "[u]pon a verdict of a jury … the clerk shall forthwith prepare, sign, and enter the judgment, unless the court orders otherwise." Here, the court stayed entry of final judgment, but it did not direct that the clerk refrain from recording the jury verdict and entering judgment *nisi* for the amount of the verdict. The clerk should have recorded the verdict as a judgment *nisi*, and also recorded the stay of any final judgment that was ordered by the court.

The Court of Appeals in *Hodgson v. Phippin*, 159 Md. 97, 101, 150 A. 118 (1930) ruled that judgment interest ran from a judgment *nisi* entered on the day of the verdict because "a litigant should not be penalized [by a denial of post-judgment interest] for delay from motions made in honest assertions of what he conceives to be his rights." Although *Hodgson* was decided under former Rule 642, the modification of Rule 642 to become current Rule 2–604(b) was intended to be non-substantive. As we explained in *Cohn v. Freeman*, 169 Md.App. 255, 262–63, 900 A.2d 283 (2006),

[Md. Rule 2–604(b)] provides, "A money judgment shall bear interest at the rate prescribed by law from the date of entry." Rule 2–604 replaced Maryland Rule 642, which provided:

> .... *A judgment on verdict shall be so entered as to carry interest from the date on which verdict was rendered.* A judgment *nisi* entered by the court following a special verdict pursuant to Rule 560 (special verdict) or by the court without jury pursuant to Rule 564 (Trial by Court) shall be so entered as to carry interest from the date of entry of judgment *nisi.* (emphasis supplied.)

Thus, ... Rule 2–604(b), while simplifying the rule by removing references to judgments *nisi,* was not intended to change the substantive law.... [T]he minutes of the Committee on Rules of Practice and Procedure [say] that "in the ordinary case when judgment is entered on a jury verdict, it is intended that the judgment will carry interest from the date on which the verdict is entered as a judgment...." (Citations omitted.)

Based on the authorities discussed above, in this case, when the jury's verdict was supplemented by an award of attorney's fees, we conclude that the purpose of the post-judgment interest was fulfilled when the trial court ordered such interest to run from the date of the jury verdict. There was no error.

### *The Estate's Cross–Appeal*

### The Court's Remittitur Of The Jury's Award Of Damages

The Estate argues that the court abused its discretion in eliminating the jury's award of interest and in denying the Estate the interest to which it was entitled under the Employment Agreement. The Employment Agreement called for interest on the quarterly payments of the Deferred Compensation Account (TEC) "at the rate of applicable federal rate at the date of termination of employment for instruments with a three (3) year term plus two percent (2%) per annum." The jury awarded $1,302,820.07, a sum that represented the

$1,024,010.43 in Fetridge's Deferred Compensation Account at the time of his termination plus contractual pre-judgment interest. The court concluded, however, that the jury's verdict was excessive, based on "the minimal evidence presented to the jury on the issue of interest, and the significant possibility that the jury accepted statements made by [the Estate's] counsel in closing argument as evidence[.]" The court reasoned that "it would be inappropriate to find that Mr. Fetridge was entitled to more that [sic] $1,024,010.43 when he was terminated. As such, this amount should have been the base for any calculation of treble damages."

"The trial practice of granting a new trial sought by the defendant, unless the plaintiff remit a portion of the verdict which the trial court deems excessive, is well established in Maryland." *Turner v. Washington Suburban Sanitary Comm'n*, 221 Md. 494, 501–02, 158 A.2d 125 (1960).

> The standard to be applied by a trial judge in determining whether a new trial should be granted on the ground of excessiveness of the verdict has been variously stated as whether the verdict is 'grossly excessive,' or 'shocks the conscience of the court,' or is 'inordinate' or 'outrageously excessive,' or even simply 'excessive.'

*Banegura v. Taylor*, 312 Md. 609, 624, 541 A.2d 969 (1988) (citations omitted). "We will not disturb a trial judge's remittitur decision except in cases of an abuse of discretion." *Owens–Illinois, Inc. v. Hunter*, 162 Md.App. 385, 415, 875 A.2d 157, *cert. denied*, 388 Md. 674, 882 A.2d 287 (2005). As we recently described the abuse of discretion in the context of a remittitur:

> " '[A] ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling.' " Rather, for us to conclude that the circuit court has abused its discretion, " '[t]he decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.' "

*Hebron Volunteer Fire Dept., Inc. v. Whitelock,* 166 Md.App. 619, 628–29, 890 A.2d 899 (2006) (citations omitted). As Judge Kenney explained for the Court in *Hebron,*

> [T]he trial court, in making its determination, must make a fair and reasonable assessment of the evidence it has seen and heard during the trial and determine the highest amount that a reasonable jury would award to fairly compensate a plaintiff for his or her loss based on that evidence. . . . . But, because of the deference to be accorded to the jury's verdict, the trial court does not make an independent determination of what it would have awarded had it been the fact finder. Instead, it only determines the amount at which it finds the award no longer excessive.

*Id.* at 642–43, 890 A.2d 899.

 The Estate contends that the court's elimination of all contractual interest was an abuse of discretion, because the plain and unambiguous terms of the Employment Agreement, Section 9(c), provided that Fetridge was entitled to payment of his TEC "in twelve (12) equal quarterly installments with interest thereon at the rate of applicable federal rate at the date of termination of employment for instruments with a three (3) year term plus two percent (2%) per annum." In the words of the Estate's brief:

> The grant of remittitur here was an abuse of discretion because the remittitur order runs contrary to the plain language of the Employment Agreement **and because the trial court itself excluded the very evidence on this question that it subsequently declared was necessary to support the jury's award.** (Emphasis added.)

We agree with the Estate. The trial court is certainly allowed broad latitude in granting a remittitur, but it does not permit the court to deviate from the undisputed terms of the parties' contract.

Contrary to the trial court's recollection, the Estate did proffer evidence of the applicable federal rate called for by the Employment Agreement through its expert witness. During argument over whether the Estate's accountant expert could

testify about several topics, the Estate proffered its last topic of testimony for the expert, and the following colloquy transpired:

[Estate's Counsel]: The one thing I'm, the one thing I'm concerned about .... [i]s ... **figuring out what the applicable [f]ederal rate is** and applying it to the undisputed balance .... for each of those periodic payments, net of whatever they show as an appropriate offset, is not an easy task for even a computer—literate calculator-bearing juror to do. So—

[Aronson's Counsel]: **It's arithmetical and all the balances are disputed. 3.3 per cent [sic] compound however you compound under the T-bill rate times zero is zero. The Court—that's an arithmetical calculation that the Court can make if you ever get there.** But having said that, all of these amounts are disputed for a number reasons, and I just want to, you know, I want to move this along because I want to make sure that I can get my expert on an airplane first thing in the morning. If the Court has now ruled on this part of expert testimony, leaving one thing left pursuant to your earlier rulings, which is, is this a wage. Is the deferred comp account a wage under the Maryland wage statute. I'd hope we could get on with that and move this case along. Thank you.

[The Court]: Is he prepared to address that?

[Estate's Counsel]: Yes, Your Honor.

[The Court]: But before [Aronson's Counsel] objected to what you were saying, you were about to get to why you're raising that.... You're talking about calculation of damages?

[Estate's Counsel]: Just the calculation of interest on the terminating employee compensation ... payments.

[The Court]: You mean how that's done?

[Estate's Counsel]: Our concern is simply that it's a complicated calculation that might, that it might assist the jury to have [the Estate's expert] walking through the

calculation. If your Honor rules that that's out of order, then we won't do it.

[The Court]: The dispute is, I mean, they dispute all the amounts. But it may be helpful to have him take them through that for whatever the amount is. You can pick an amount out of a hat. It doesn't matter what it is. If your concern is how it's done, you can just take $100 and walk them through how it's done, if that is the concern.

[Aronson's Counsel]: There's no dispute.

[The Court]: About how it's done?

[Aronson's Counsel]: Well, I don't know whether ... there is or not. **The terms of the contract, the terms of the contract provide whatever it is he's entitled to.** (Emphasis added.)

The court then examined Section 9(c) of the Employment Agreement and said:

[The Court]: Termination of employment. Involuntary termination disability. Terminating, terminating employee compensation, page 7, paragraph 9. Equal quarter installments with interest **at the rate of an applicable Federal rate on the date of termination of the employees for instruments (unintelligible), pretty much sets forth how they should do it.**

[Aronson's Counsel]: This expert's in no position to make a calculation because we don't have an amount to determine. The contract sets out—

[The Court]: How it's done.

[Aronson's Counsel]: That's right. **And so if it is to be done, you can fashion a jury verdict sheet, show that the calculation is arithmetical**. . . .

[The Court]: I think he's right, don't you, counsel. It says right here in paragraph 9(c) how you do it.

[Estate's Counsel]: *Very well.* (Emphasis added.)

The Estate did not produce any additional evidence concerning the applicable rate of interest at the date of termination.

Its counsel argued in closing, without any objection from Aronson:

Section 9(c) of the contract says that amount gets paid in 12 equal quarterly installments with interest at the rate of the applicable federal rate at the date of termination of employment for instruments with a three-year term, which we believe to [be] 4.07 percent, plus 2 percent, for a total of 6.07 percent.

Based on this record, we conclude that the trial court abused its discretion in granting a remittitur to eliminate all contractual interest. The Estate proffered that its expert could testify about what the federal rate was, and could demonstrate how to compound it. Opposing counsel and the court led plaintiff to believe that he did not need to prove the interest rate, that it was just a matter of "arithmetic" that the court could perform. But the court then granted the remittitur based on the Estate's failure to prove the amount of interest. Given the Estate's proffer, and the statements by the trial court and Aronson's counsel that it was just "arithmetic" and no expert was necessary, the court's ruling was an abuse of discretion. This is not a question of the court "lopping off" excess damages. The Agreement says that the "applicable federal rate" must be used. Aronson never raised an issued about what that was, and never objected to Fetridge's counsel's assertion during closing that it was 4.07 percent The granting of the remittitur violated the terms of the contract between the parties.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED IN PART AND REVERSED IN PART, AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLANT.**