**HEADNOTE**: *Brian Blood v. Columbus US, Inc.*, No. 1962, September Term, 2016. Opinion by Wright, Alexander.


**LABOR AND EMPLOYMENT – WHAT ARE WAGES IN GENERAL**


Employee's right to receive compensation from a non-compete clause was not compensation for work performed prior to termination under the Wage Payment and Collection Law; non-compete was a disqualifying quid pro quo.  Accordingly, the circuit court did not err in its judgment.

In the Circuit Court for Frederick County

Case #10-C-16-001404

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1962

September Term, 2016

_____

BRIAN BLOOD

v.

COLUMBUS US, INC.

_____

Wright,
Reed,
Eyler, James R.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Wright, J.

_____

Filed:   April 30, 2018

This appeal follows denial of Brian Blood's ("Blood") Claim of Lien for Unpaid Wages in the Circuit Court for Frederick County.[1]  After an evidentiary hearing, the circuit court extinguished Blood's Claim of Lien against Columbus US, Inc., ("Columbus"), appellee, and granted Columbus's request for an order denying the Claim of Lien.  Blood now appeals to this Court, and presents the following question for our review, which we have reworded for clarity:[2]

> Did the circuit court err in ruling that Blood's contractual remuneration compensation did not qualify as "wages" under the Maryland Wage Payment and Collection Act?

> For reasons to follow, we answer this question in the negative and affirm the

judgment.

---

[1] *See* Md. Code (1991, 2016 Repl. Vol.), Labor and Employment Article ("L&E") § 3-1104. **Establishing lien**.

A lien for unpaid wages is established:

(1) after a circuit court issues an order to establish a lien for unpaid wages; or

(2) if no complaint disputing the lien for unpaid wages is filed, within 30 days after a notice is served under § 3-1102 of this subtitle.

[2] Blood presented his question as follows:

Did the Circuit Court err in ruling that Appellee's contractual remuneration compensation does not qualify as "wages" under the Maryland Lien for Unpaid Wages Law or the Maryland Wage Payment and Collection Act?

# BACKGROUND

The present case arises from a contractual dispute between Blood and his former employer, Columbus. Blood was the joint owner of an IT[3] business, in which Columbus purchased an interest during the late 1990's and which Columbus purchased in full, in 2004. On January 4, 2004, Blood entered into a Vice President Contract ("VP Contract") with Columbus. At issue in this dispute is Blood's and Columbus's interpretation of Section 10 of the VP Contract, which describes the Non-Competition Clause. Section 10 states in relevant part:

> **10.4** *In exchange for* clause 10.1 excluding 10.1a limitation[4] (ref. Appendix 2), the Company shall pay remunerations equal to 100% of the VP's fixed salary, as stated in Appendix 2, upon the Company's termination of the [VP's] Contract. The remuneration shall be paid in equal monthly installments over the period in which the non-competition clause applies.
>
> **10.4a** *In exchange for* clause 10.1 incl. 10.1a (ref. Appendix 2), the Company shall pay remunerations equal to 50% of the VP's fixed salary, as stated in Appendix 2, upon the Company's termination of the [VP's] Contract. The remuneration shall be paid in equal monthly installments over the period in which the non-competition clause applies.
>
> **10.5** Where the VP violates [the non-compete] the VP shall be obliged to pay liquidated damages equal to six monthly fixed salary installments. When this clause is violated, one infringement is equal to each calendar month or part thereof in which violation takes place. Where the Company of Columbus's loss exceeds the liquidated damages, the VP shall be held liable for damages.

---

[3] Information Technology.

[4] On January 1, 2004, Blood signed and agreed to excluding the limitation clause 10.1a in Appendix 2 of the VP Contract, thereby binding himself to a 100% remuneration for his agreement not to compete with Columbus. The VP Contract continued to roll over year to year.

**10.8**   The Company may waive its rights under this non-competition clause, and thus its obligation to pay remuneration, by written notice to the VP.  The notice shall be given no more than 14 days after the Company has notified the VP of the termination of his employment, or has received the VP's notice of resignation.

(Emphasis added).

On June 1, 2015, Blood provided Columbus with six months' notice of his resignation, and he resigned from his position on December 1, 2015.[5]  At the end of that month, Blood wrote to the Managing Director of Columbus that, because "Columbus did not notify [him] within 14-days of [his] notice of resignation that [it] was waiving the non-competition clause," he was entitled to receive 100% of his fixed salary pursuant to Section 10.4 of the VP Contract.  In January of 2016, counsel for Blood and Columbus exchanged letters regarding their interpretation of Section 10.4 of the VP Contract.  Columbus argued that Section 10.4 only applied to Columbus's termination of Blood, not Blood's voluntary termination.[6]  Conversely, Blood maintained that he was entitled to the non-compete remuneration.[7]

On April 19, 2016, Blood sent Columbus a Notice to Employer of Intent to Claim Lien for Unpaid Wages alleging that Columbus did not timely and regularly pay him

---

[5] Columbus had 14 days to provide Blood with written notice that it was waiving its non-compete after notice of his resignation.

[6] Columbus made this contention in two letters dated January 15, 2016, and January 29, 2016, but does not advance this contention on appeal.

[7] Blood's counsel made this contention in a letter to the Managing Director of Columbus dated January 15, 2016.  Blood's counsel sent this letter to Columbus before Blood was in receipt of Columbus's January 13, 2016 letter.

wages due and owed under Section 10.4 of the VP Contract through April 1, 2016.[8]

Blood claimed that Columbus owed him at least $53,333.32 in unpaid wages.[9]  On May

16, 2016, Columbus filed a complaint for an order denying Blood's Claim of Lien for

Unpaid Wages arguing that, because Blood's remuneration was conditioned on a

covenant not to compete, it was not recoverable under the Wage Payment Act.[10]

On June 20, 2016, Blood responded to Columbus's complaint, arguing that

"[Section] 10.8 of the contract clearly contemplate[d] that the payments [were] payable

even after [Blood's] resignation," and that the payments were akin to those at issue in

*Aronson & Co. v. Fetridge*, 181 Md. App. 650 (2008).  On or about July 1, 2016, Blood

---

[8] L&E § 3-1102. **Notice required; contents**.

To establish a lien for unpaid wages under § 3-1104 of this subtitle, an employee shall first provide written notice to an employer that:

(1) is served on the employer within the statute of limitations period under § 5-101 of the Courts Article;

(2) is personally served in accordance with Maryland Rule 2-121; and

(3) contains the information required by the Commissioner under  § 3-1110 of this subtitle to provide the employer with adequate notice of the wages claimed and the property against which the lien for unpaid wages is sought.

[9] Blood claimed that Columbus should have paid these wages on January 1, 2016; February 1, 2016; March 1, 2016; and April 1, 2016.

[10] Columbus also claimed that Maryland courts did not have jurisdiction over this contractual dispute because the contract mandates that contractual disputes will be governed by the laws of the State of Delaware.  However, § 3-1107 of the Wage Payment Act provides that "[a] contract between an employee and an employer may not waive or require the employee to waive the right to seek the establishment of a lien for unpaid wages[. ]" Columbus has not made the choice of law arguments on appeal.

sent Columbus a second Notice to Employer of Intent to Claim a Lien for Unpaid Wages that were allegedly due on May 1, 2016, and June 1, 2016. Columbus failed to file a complaint in the circuit court within the mandatory 30 days.[11] On August 15, 2016, Blood recorded the wage lien against Columbus pursuant to Md. Code (1991, 2016 Repl. Vol.), Labor and Employment Article ("L&E") § 3-1103(b)(1). After Columbus became aware of the recorded wage lien, it filed a Petition to Extinguish a Recorded Wage Lien on August 19, 2016, which was later amended to a Complaint to Extinguish Recorded Wage Lien.

The case came before the circuit court on September 2, 2016, for an evidentiary hearing on Columbus's Complaint Requesting an Order Denying Defendant's Claim for a Lien for Unpaid Wages. At the hearing, Blood's counsel maintained that because the VP Contract did not state that Blood's remunerations would cease if he violated the non-compete, it did not constitute a *quid pro quo*, and fell within the scope of the Wage Payment Act. Conversely, Columbus's counsel maintained that Section 10 of the VP Contract was a *quid pro quo* because it conditioned payment on Blood's non-competition. Thus, Columbus argued, Blood's reliance on our decision in *Aronson* was misplaced because in that case the employee's deferred compensation was not conditioned on a non-compete since the employer determined the compensation every year.

---

[11] L&E § 3-1103(b)(1) provides that an employer may dispute a lien for unpaid wages "within 30 days after notice is served on the employer."

5

In making its findings, the circuit court addressed whether Blood's remuneration fell within the scope of the Wage Payment Act and found it did not.[12] In reviewing whether Blood's remuneration was similar to the remuneration in *Stevenson v. Branch Banking and Trust Corp.*, 159 Md. App. 620 (2004), or *Aronson,* the court determined that the language of "in exchange for" contained in the VP Contract rendered it a *quid pro quo*. The case was distinguishable from the compensation agreement in *Aronson* because "the compensation owed was for the employee's services completed *prior* to termination." (Emphasis added). The court also contrasted Blood's compensation from the disputed compensation in *Medex v. McCabe*, 372 Md. 28 (2002), because Blood's remuneration was tied to his non-competition for a period of time following termination, and therefore, was not a "wage." The circuit court held that the prevailing Maryland case law dictated that Blood's remunerations were not "wages," and it denied Blood's claim for a Wage Lien and extinguished his Wage Lien.[13]

Additional facts will be added as they become relevant to our analysis.

## STANDARD OF REVIEW

Where an order appealed from "involves an interpretation and application of Maryland statutory and case law, [we] must determine whether the [circuit court's]

---

[12] L&E § 3-1103(d)(2) provides that, "the circuit court shall determine whether to issue an order establishing a lien for unpaid wages . . . based on a preponderance of the evidence in which the employee has the burden of proof to establish the lien for unpaid wages."

[13] The record indicates that a Wage Lien was filed against Columbus, when it did not timely respond to Blood's Notice of Lien, but does not contain a filing date.

6

conclusions are 'legally correct' under a *de novo* standard of review." *Walter v. Gunter*, 367 Md. 386, 392 (2002). Additionally, the interpretation of contracts is a question of law for the court. *Calomiris v. Woods*, 353 Md. 425, 434 (1999).

Generally, on appeal of an action tried without a jury, such as here, we are bound by the circuit court's findings of fact unless they are clearly erroneous. Md. Rule 8-131(c); *see also Cunningham v. Feinberg*, 441 Md. 310, 321-22 (2015). We typically afford no deference to the circuit court's legal determinations and conclusions of law, reviewing them *de novo*. *See Shih Ping Li v. Tzu Lee*, 437 Md. 47, 57 (2014). These legal determinations and conclusions of law also apply to the interpretation of contracts. *Sy-Lene of Washington, Inc. v. Starwood Urban Retail*, 376 Md. 157, 163 (2003). As the circuit court's determination of whether Blood's remuneration compensation was a "wage" was conditioned on the interpretation of the Wage Payment Act by Maryland's appellate courts, we review its decision *de novo*.

## DISCUSSION

### I.

### The Applicability of the Maryland Wage Payment Act to the Non-Compete Provision

The crux of Blood's argument was, and is, that his remuneration compensation under the VP Contract qualified either as a "fringe benefit" or "any other remuneration promised for service." Blood argues that his VP Contract was the same as the non-compete compensation we held were "wages" under the Wage Payment Act in *Aronson*.

7

Conversely, Columbus contends that Blood's remuneration compensation is a *quid pro quo*, similar to the severance package at issue in *Stevenson.*

While the Maryland Lien for Unpaid Wages Law does not define "wage," the Maryland Wage Payment and Collection Act provides further guidance.[14]  The Maryland Wage Payment and Collection Act was intended "to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages." *Medex v. McCabe*, 372 Md. 28, 39 (2002).  The Wage Law, in L&E § 3-501(c)(1), defines the term "[w]age" to mean "all compensation that is due to an employee for employment."  L&E § 3-501(c)(2) adds that a "[w]age" includes: (i) a bonus; (ii) a commission; (iii) a fringe benefit; or (iv) any other remuneration promised for service."  This right to compensation vests only when an employee "ha[s] performed all the work necessary to earn the [compensation] *before termination*." *Medex*, 372 Md. at 37; *see also Whiting-Turner v. Fitzpatrick,* 366 Md. 295, 304-05 (2001) (emphasis added).  The Court of Appeals has established a bright line test, stating that once a "bonus, commission or fringe benefit has been promised as part of the compensation for service, the employee would be entitled to its enforcement as wages." *Whiting & Turner*, 366 Md. at 305.  And "it is the *exchange of remuneration* for the employee's work that is crucial to the determination" of whether that compensation is a "wage." *Medex*, 372 Md. at 36 (emphasis added).  Thus, if Blood's remuneration was in "exchange" for work performed before termination, or as a result of employment, it

---

[14] L&E § 3-1101(d) states only that the term "'wages' does not include commissions."

will fall under the scope of the Act. *See Whiting-Turner*, 366 Md. at 303; *Stevenson*, 159 Md. App. at 644.

We begin our analysis of this issue by examining two cases the parties rely on to support their positions. Although the parties are misguided in arguing that this case fits neatly with either *Stevenson* or *Aronson*, the interpretation of "wages" and the Wage Payment Act in both cases necessarily frames our analysis.

In *Stevenson*, we considered whether an employee could recover wages from a Termination Compensation provision under the Wage Payment Act when an employment agreement explicitly conditioned Compensation on a non-compete covenant. *Stevenson*, 159 Md. App. at 645-47. The Employment Agreement stated, "if Employee breaches [the non-compete in] section 4(a) of this Agreement during the period [s]he is receiving Termination Compensation, Employee will not be entitled to receive any further Termination Compensation [.]" *Id.* While we found that a severance benefit, based on the length or nature of an employee's service, and promised upon termination, might be recoverable under the Act, we concluded that Stevenson's Termination Compensation compensated her for two years that she would not be working with her employer. *Id.* at 644-45. Specifically, the Employment Agreement stipulated that if Stevenson competed with her employer, she would not be entitled to receive any further Termination Compensation, creating an explicit *quid pro quo*. *Id.* at 646.

In *Aronson*, we considered whether an employee who had involuntarily terminated could recover wages from a Terminating Employee Compensation ("TEC") under the

Wage Payment Act. 181 Md. App. at 668-72. Section 9(a) of the Employment Agreement stated, "[p]ursuant to this Agreement, whenever [Fetridge] shall be entitled to receive [TEC], he . . . shall be entitled to receive payment of an amount equal to [his] Deferred Compensation Account[.]" *Id*. at 658. Although the Agreement contained a covenant not to compete for a period of three years, we found that the remunerations were not like the *quid pro quo* in *Stevenson*. Fetridge's employer argued that the TEC was conditioned on Fetridge's compliance with the covenant not to compete. *Id*. at 666. Aronson cited *Stevenson*, arguing that "a payment conditioned on a covenant not to compete is not recoverable under the Wage Law," even if the employee did not violate the covenant. Aronson was asserting that Fetridge's Agreement was like that in *Stevenson* because the TEC was "subject to a setoff right." *Id*. Aronson believed that its right to setoff converted the TEC into post-termination compensation, rendering it beyond the scope of the Wage Law. *Id*. at 666-67. We found that argument unpersuasive.

We concluded that Fetridge's TEC vested upon his termination and was tied to his Deferred Compensation Account, which began during his employment. *Id*. at 678-80. Unlike the severance compensation at issue in *Stevenson*, Fetridge's Agreement did not explicitly state that the TEC would end if Fetridge competed with Aronson. We determined that Aronson's "right to offset" functioned the way a traditional setoff would, establishing Aronson's right to reduce the amount of termination compensation owed to Fetridge under the TEC. *Id*. at 668. Thus, whether or not he violated the covenant not to

compete, Fetridge was entitled to continue receiving the TEC, which we found not to be a disqualifying *quid pro quo*. *Id.*

Blood argues that our holding in *Aronson* governs the disposition of this case. Blood avers that his remuneration vested in December of 2004 when he signed his contract, and that the "in exchange for" language creates two options that Blood could elect to exercise: (1) bind himself to a non-compete to receive 100% of his VP fixed salary, an oppressive option or (2) bind himself to a non-compete for 50% remuneration. Blood urges us to read the VP Contract broadly, taking into consideration the inclusion of the remuneration compensation in the definition of "salary" in Section 4.2; the inclusion of the non-competition selection in Appendix 2;[15] and the inclusion of "fringe benefit" in the definition of wages in the Wage Payment Act.

Columbus responded that *Stevenson* is the controlling case law. Columbus asserted that "Blood's post-employment compensation is not 'deferred compensation for work performed during employment' or 'based on the length or nature of [Blood's] service.'" *Stevenson*, 159 Md. App. at 644. Columbus avers that, contrary to Blood's contention, Section 10.5 is not an offset – if Blood violates the non-compete, Columbus is excused from paying Blood the remuneration pursuant to Section 10.4.

In *Stevenson*, we found that a *quid pro quo* existed because the terms of the employment contract made it clear that Stevenson's termination compensation was

---

[15] Appendix 2 outlined the Compensation for Blood. Blood's Non-Competition provision is nested under Appendix 2, and he signed to exclude the MBS limitation clause 10.1a.

11

explicitly tied to her duty not to compete with her employer. The relevant provision is as

follows:

> [Section 6(c)]: . . . Notwithstanding anything in this Agreement to the contrary, if Employee breaches [the non-compete provisions in] section 4(a) of this Agreement during the period that [s]he is receiving Termination Compensation, Employee will not be entitled to receive any further Termination Compensation[.]

*Stevenson*, 159 Md. at 645 (emphasis added).

There is no such explicit clause in Blood's agreement. But notwithstanding the

above, Blood's employment agreement established that his non-compete compensation is

"remuneration promised for [Blood's] services" in refraining from competing with

Columbus and is not a wage "due for work that [Blood] performed before the termination

of [his] employment[.]"[16] As the Court of Appeals emphasized in *Whiting-Turner* and

---

[16] L&E § 3-505. **Payment on termination of employment; accrued leave**.

(a) *In general.* – Except as provided in subsection (b) of this section, each employer shall pay an employee or the authorized representative of an employee all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated.

(b) *Payment of accrued leave.* – An employer is not required to pay accrued leave to an employee if:

(1) the employer has a written policy that limits the compensation of accrued leave to employees;

(2) the employer notified the employee of the employer's leave benefits in accordance with § 3-504(a)(1) of this subtitle; and

(3) the employee is not entitled to payment for accrued leave at termination under the terms of the employer's written policy.

12

*Medex*, "an employee's right to compensation vests [only] when the employee does everything required to earn the wages," and the Wage Payment Act affords relief only when the employee "ha[s] performed all the work necessary to earn [compensation] *before termination.*" *Medex*, 372 Md. at 37; *see also Whiting-Turner*, 366 Md. at 304-05; (emphasis added).

Blood relies heavily upon our decision in *Aronson*, which is distinguishable from the case *sub judice*. In *Aronson*, the language of the employment agreement provides that the employee, Fetridge, would continue receiving his TEC, even if he violated the covenant not to compete. Specifically, Fetridge's employee agreement stated "whenever [Fetridge] shall be entitled to receive 'Terminating Employee Compensation,' he . . . shall be entitled to receive payment of an amount equal to [his] Deferred Compensation Account . . . ." *Aronson*, 181 Md. at 658. The Deferred Compensation Account was determined annually in May of every year that Aronson employed Fetridge. *Id.* at 659. Fetridge's compensation was a "wage" because it was tied to a TEC that vested during his employment. There exists no comparable Deferred Compensation Account that would have vested in this case that was created contemporaneously with Blood's promise not to compete. [17] In fact, section 9 of the VP Contract governs restrictions on

---

[17] Blood, pursuant to sections 10.4 and 10.4a, had the option to receive remunerations equal to 100% or 50% of the VP's fixed salary depending on the scope of the non-competition clause. Blood could have decided to take "door number three" whereupon he would not be burdened with a non-competition clause and thereupon provided no "remunerations" at all as he was not obligated to promise not to compete.

13

involvement in other businesses during employment. If Columbus intended to create a Deferred Compensation Account to compensate Blood for adhering to a non-compete, it could have created it as compensation in section 9 – it did not.[18] On its face, and given its contractual language, specifically the phrase "in exchange for," it is clear that this was not compensation that vested during Blood's employment, but only vested and accrued *after* employment and, accordingly, is not a "wage." Although in this case there is an arrangement under which Blood would be obligated for liquidated damages had he violated the non-compete agreement, that alone is not dispositive when the remuneration was not promised as part of compensation for service. *See Aronson*, 181 Md. 667-68.

As we have stated, this case does not fit neatly under either *Stevenson* or *Aronson*, but following the dictates of both, we hold that Blood does not have a Wage Payment Act claim with respect to Columbus's refusal to pay him for the non-competition clause of the VP Contract because (1) L&E § 3-507.1 may be invoked only when the employer "fails

---

[18] Section 9 of the VP Contract governs restrictions on involvement in other businesses during employment and states that the VP shall not:

> (01) During his employment under this Contract carry on or be directly or indirectly concerned, engaged or interested (whether as a principal, shareholder, partner, employee, agent, consultant, adviser or otherwise) in any trade or business which competes with the business of the Company or Columbus; or

> (02) Carry on or be concerned, engaged or interested in any other trade or business without the previous consent of the Board evidenced in writing (which may be given subject to certain terms or conditions the breach of which shall be deemed a breach under this Contract).

> (03) Disclosure of current concerned, engagement or interests are stated in Appendix 3.

14

to pay an employee in accordance with § 3-505," (2) L&E § 3-505 applies only to employers who do not promptly pay all "wages due for work that the employee performed before the termination of employment[,]" and (3) Blood's Non-Competition Clause Compensation, when tied with the *quid pro quo* promise not to compete as verified in Appendix 2, is not payment "for work [Blood] performed before the termination of employment."

## II.

## Treble Damages and Attorney's Fees

Under the Wage Payment Act, a court can award triple treble damages if it determines that there is not a "bona fide dispute." However, if the court determines a "bona fide dispute" exists, it cannot award triple treble damages. An employer bears the burden of producing evidence that a "bona fide dispute" existed. The Court of Appeals has defined a "bona fide dispute" as "a dispute . . . in which the employer resisting the employee's claim . . . 'has a good faith basis for doing so,' where there is a 'legitimate dispute over the validity of the claim'" or the amount owed. *Admiral Mortg., Inc. v. Cooper*, 357 Md. 533, 543 (2000). Generally, these disputes "depend on the circumstances" and are considered a matter for the jury. *Cooper*, 357 Md. at 533, 541; *see Medex*, 372 Md. at 44.

At the heart of both Blood's and Columbus's arguments is whether or not the remuneration constituted a "wage" for the purposes of the Wage Payment Act. Columbus proffered in its briefs and the evidentiary hearing that a "bona fide dispute" existed because it has a "good faith basis" for rejecting Blood's claim to the remuneration

15

compensation. We have ruled in Columbus's favor and that forecloses an award for treble damages as wages are not owed to Blood.

## CONCLUSION

Our reading of Maryland case law regarding "wages" under the Wage Payment Act and our interpretation of the VP Contract leads us to conclude that Blood's remuneration payments were not "wages" for the purposes of the Act and constituted a *quid pro quo.* Accordingly, we affirm the circuit court's judgment.

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**