*Playmark, Inc. et al. v. Perret*, No. 0091, September Term 2020, filed January 28, 2022.
Opinion by Friedman, J.

**HEADNOTES:**

CORPORATIONS AND BUSINESS ORGANIZATIONS — SUCCESSOR LIABILITY

A corporation can be held liable for its predecessor's obligations if two criteria are met. *First*, the corporation must be a "successor," which is defined by statute as (1) a new corporation formed by consolidation; (2) a corporation or other entity surviving a merger; (3) a corporation acquiring stock in a share exchange; or (4) a vendee, lessee, or other transferee in a transfer of assets. *Second*, the transfer must meet one of the four common law exceptions to the general rule of non-liability: (1) there is an expressed or implied assumption of liability; (2) the transaction amounts to a consolidation or merger; (3) the purchasing corporation is a mere continuation of the selling corporation; or (4) the transaction is entered into fraudulently to escape liability for debts.

CORPORATIONS AND BUSINESS ORGANIZATIONS — TRANSFER OF ASSETS — ALL OR SUBSTANTIALLY ALL OF A CORPORATION'S ASSETS

Read together, the statutory requirement to qualify as a successor is that "all or substantially all of the assets" are transferred *from* the predecessor corporation, not that "all or substantially all of the assets" are transferred *to* a particular transferee.

LABOR AND EMPLOYMENT — WAGE PAYMENT AND COLLECTION LAW — WAGES — COVENANTS NOT TO COMPETE

The mere inclusion of a covenant not to compete does not automatically remove post-employment payments from the realm of "wages" and the scope of the Wage Act if those benefits are (1) promised in exchange for employment, and (2) not expressly conditioned on continuing compliance with the covenant not to compete post-employment.

Circuit Court for Montgomery County
Case No. 464579V

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0091

September Term, 2020

———————————————————

PLAYMARK INC., ET AL.,

v.

JAMES P. PERRET

———————————————————

Berger,
Friedman,
Gould,*

JJ.

———————————————————

Opinion by Friedman, J.

———————————————————

Filed: January 28, 2022

* Judge Steven B. Gould, now a judge of the Court of Appeals of Maryland, was a member of the panel assigned to consider this appeal prior to his elevation to the Court of Appeals. Judge Gould did not participate in the drafting of this opinion or its adoption.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

James Perret entered into a contract to perform services for (AAA) Sport Systems, Inc. ("AAA"). AAA no longer exists, and its corporate successors, Playmark, Inc. ("Playmark") and Pro Recreation, LLC ("Pro Rec"), now seek to avoid paying him. We hold that Playmark and Pro Rec each bear successor liability for the contractual obligations of AAA and, therefore, affirm the circuit court's judgment for breach of contract in favor of Perret as well as the circuit court's declaration of Perret's right to receive future payments from Playmark and Pro Rec. Additionally, however, we hold that Playmark and Pro Rec are also statutorily obligated to pay Perret under Maryland's Wage Payment and Collection Law and, therefore, reverse the circuit court's pretrial dismissal of that claim. We remand for appropriate proceedings.

## FACTUAL BACKGROUND

### I. CORPORATE HISTORY

In the mid-1980s, Tilford Jones created AAA, a Maryland corporation engaged in the business of selling, constructing, and installing playground equipment, tennis courts, and tennis backboards. Although Jones was initially the sole owner of AAA, sometime after marrying Sarah Rodowsky in 1987, Rodowsky became a joint owner of the company.[1]

In 2005, Jones and Rodowsky split AAA into two new limited liability companies: Sportco, LLC ("Sportco") and Sport Systems, LLC ("Sport Systems"), each of which they

---

[1] The record does not disclose whether or how much Rodowsky paid for her interest in AAA.

also jointly owned.[2] Sportco and Sport Systems were formed on the same day, and the companies shared an address in Ijamsville, Maryland. The assets of AAA were divided between the two new companies. Sportco received, among other things, AAA's physical assets, such as trucks and other equipment. Sport Systems, which was created as the operating arm of the business, received AAA's less tangible assets, including the company's employees, contracts, clients, and goodwill. Thereafter, the two companies continued to operate together, with Sportco leasing trucks and other equipment to its sole customer, Sport Systems. In turn, Sport Systems fulfilled contracts for the manufacture, installation, and distribution of tennis courts, tennis backboards, and playground equipment, just as AAA had previously done.

In 2017, Jones and Rodowsky's personal relationship soured, and they began divorce proceedings. As part of their divorce settlement, they entered into a Business Management Agreement ("BMA") to divide their ownership of Sportco and Sport Systems. The purpose of the BMA was for "each party [to] have sole control and ownership of a new entity." Accordingly, Jones formed Pro Rec to carry on the tennis court and tennis backboard divisions of the businesses. Rodowsky formed Playmark to carry on the playground services division of the businesses. Today, Pro Rec, solely owned by Jones, and Playmark, solely owned by Rodowsky, carry on these businesses. We have created the

---

[2] Although not necessary for this analysis, we understand that Jones and Rodowsky initially formed Sportco and Mid Atlantic Sports, LLC ("Mid Atlantic"). Thereafter, AAA merged into Sportco, and in 2010, Mid Atlantic became Sport Systems.

2

following graphical representation of the corporate history, with each transfer numbered in the order in which we address them in the discussion below:[3]



Figure 1

## II.    PERRET'S EMPLOYMENT HISTORY

In the late 1990s, AAA hired James Perret as a salesperson. Perret was rapidly promoted to general manager in 1998, at which time he signed an Employee Non-Competition and Confidentiality Agreement ("Non-Compete Agreement") with AAA. The Non-Compete Agreement prohibited Perret from engaging in a range of competitive behaviors while employed by AAA and for three years thereafter. In 2000,

---

[3] We note that we have simplified the transactions here by omitting the role of Fenway Assets, Inc., a holding company also jointly owned by Jones and Rodowsky, and Mid Atlantic, as discussed in n.2 above.

Perret and AAA entered into an Executive Management Agreement ("EMA"), in which AAA promised to provide Perret with retirement benefits if he continued in its employment. As relevant to this appeal, if Perret continued to work in a managerial capacity from 2000 to 2015, AAA agreed to pay Perret $25,000 per year for the next ten years, for a total of $250,000. The payments were to be made quarterly, on January 1st, March 1st, June 1st, and October 1st, of each year.

Perret continued working for AAA and its successors until June of 2018, not only fulfilling, but surpassing the fifteen-year term set forth in the EMA. In accordance with the terms, Sport Systems made payments to Perret from 2015 through 2018, for a total of $100,000.

By the time Perret retired, Jones and Rodowsky were already planning to restructure their respective interests in Sportco and Sport Systems, but they assured Perret that they would, nonetheless, continue making payments to him under the terms of the EMA. For example, just before Perret retired, Rodowsky sent Perret a letter on Sport Systems' letterhead confirming his resignation and indicating that the terms of the EMA were still in effect. Also in June of 2018, Sport Systems' attorney, Michael Rowan, sent a letter to Perret ("2018 Rowan Letter") telling Perret how the two new entities, Playmark and Pro Rec, would handle the remaining payments:

> This letter serves to clear up obligations going forward. Ms. Rodowsky and Mr. Jones are in the process of dividing up what was known as Sport Systems, LLC. The obligations you owe to the entity and them [i.e. Rodowsky and Jones] will flow to their entities *and likewise the obligations the entity owes to you will flow to these new entities*.

4

Mr. Jones' successor entity is named Pro Recreation, LLC, dba Sport Systems. Ms. Rodowsky will continue to operate Sport Systems, LLC, which will operate as Eagle Play Structures or a new name.

\* \* \*

Further, given the split of the Sport Systems, LLC, Ms. Rodowsky and Mr. Jones have agreed *their new entities will each be 50% responsible for the payments due to you under the [EMA]*.

(emphasis added). Moreover, the BMA, by which Jones and Rodowsky divided up Sportco and Sport Systems amongst themselves, explicitly provided that "Perret shall be paid $25,000.00 per year for six years, commencing in 2018, and each party's newly formed company [Playmark and Pro Rec] shall bear one-half the annual cost ($12,500.00) of the same." Despite these assurances that the payments would continue, no further payments were made.

## PROCEDURAL HISTORY

In March of 2019, Perret filed suit in the Circuit Court for Montgomery County against Playmark and Pro Rec; their predecessor, Sport Systems; and Jones and Rodowsky, individually. Perret alleged that the missed payments[4] (1) were a breach of the EMA, and (2) violated the Maryland Wage Payment and Collection Law ("Wage Act").[5] MD. CODE,

---

[4] At the time Perret filed suit, only one quarterly payment was overdue. By the time the case was tried in January of 2020, however, five payments were overdue.

[5] In his complaint, Perret also alleged that the missed payments violated the Maryland Wage and Hour Law, LABOR AND EMPLOYMENT ("LE") § 3-401 *et seq.* (a different act than the Wage Act). The circuit court dismissed this claim pre-trial. Because Perret did not appeal from that decision, we do not consider that claim here.

LABOR AND EMPLOYMENT ("LE") §3-501 *et seq*. Perret also sought a declaratory judgment that he was entitled to receive the quarterly EMA payments from Playmark and Pro Rec going forward. Before trial, the circuit court dismissed Perret's claims against Jones and Rodowsky in their individual capacities. The court also dismissed Perret's claim under the Wage Act.

After a two-day bench trial, the circuit court entered judgment for breach of contract in favor of Perret and against Playmark and Pro Rec for the five quarterly EMA payments that were then overdue. The circuit court also entered a declaratory judgment that Perret was entitled to receive the quarterly EMA payments from Playmark and Pro Rec going forward. Perret moved for reconsideration of the pre-trial dismissal of the Wage Act claim, but the circuit court denied that motion.

Playmark and Pro Rec noted timely appeals of the breach of contract and declaratory judgments. Perret noted a timely cross-appeal of the circuit court's pre-trial dismissal of his claim under the Wage Act.

**DISCUSSION**

On appeal, Playmark and Pro Rec argue that they are not obligated to pay Perret under the EMA for two primary reasons: *first*, because Playmark and Pro Rec do not meet the statutory definition of corporate "successors" to AAA; and *second*, even if they are AAA's successors, they did not assume liability for AAA's obligation to Perret. On cross-appeal, Perret argues that the failure to make timely EMA payments constitutes not only a breach of contract but also a violation of the Wage Act, and that the circuit court consequently erred in dismissing this statutory claim. As we explain below, we conclude

6

that the circuit court did not err in finding that Playmark and Pro Rec had an obligation to pay Perret under the EMA. We, thus, affirm the circuit court's breach of contract judgment against Playmark and Pro Rec for the overdue payments as well as the circuit court's declaratory judgment that Perret has a right to receive the remaining future payments from Playmark and Pro Rec. We also hold, however, that the circuit court erred in dismissing Perret's claim under the Wage Act and, thus, reverse and remand for additional proceedings.

## I.    CONTRACTUAL OBLIGATION TO PAY UNDER THE EMA

We turn first to the question of whether Playmark and Pro Rec are obligated to make good on AAA's promise to pay Perret under the EMA. Although Perret initially entered into the EMA with AAA, AAA no longer exists. We are, therefore, tasked with determining whether and how liability for the obligation passed from AAA to the subsequent companies owned by Jones and Rodowsky: first to Sportco and Sport Systems, and later to Playmark and Pro Rec.

As a general rule of Maryland corporate law, a corporation that acquires all or part of the assets of another corporation is not liable for the debts and liabilities of its predecessor.[6] *Nissen Corp. v. Miller*, 323 Md. 613, 617, 632 (1991). A corporation can,

---

[6] We have previously applied successor liability to LLCs in the same way it is applied to corporations. *Martin v. TWP Enters., Inc.*, 227 Md. App. 33, 60-63 (2016) (applying successor liability to a transfer of assets involving an LLC); *see also* 63 AM. JUR. 2D *Products Liability* § 120 (2021) ("The traditional rule of corporate successor liability and the exceptions to the rule are generally applied regardless of whether the predecessor or successor organization was a corporation or some other form of business organization").

however, be held liable for its predecessor's obligations if two criteria are met. *First*, the corporation must be a "successor," which is defined by statute as "(1) a new corporation formed by consolidation; (2) a corporation or other entity surviving a merger; (3) a corporation acquiring stock in a share exchange; or (4) a vendee, lessee, or other transferee in a transfer of assets." MD. CODE, CORPORATIONS & ASSOCIATIONS ("CA") § 1-101(dd). As specifically relevant here, to affect a "transfer of assets" means "to sell, lease, exchange, or otherwise transfer all or substantially all of the assets of a corporation," CA § 1-101(ee), wherein assets are "any tangible, intangible, real or personal property or other assets, including goodwill." CA § 1-101(d). *Second*, the transfer must meet one of the four common law exceptions to the general rule of non-liability: "(1) there is an expressed or implied assumption of liability; (2) the transaction amounts to a consolidation or merger; (3) the purchasing corporation is a mere continuation of the selling corporation; or (4) the transaction is entered into fraudulently to escape liability for debts." *Balt. Luggage Co. v. Holtzman*, 80 Md. App. 282, 290 (1989) (citing *Golden State Bottling Co. v. Nat'l Labor Relations Bd.*, 414 U.S. 168, 182-83 n.5 (1973)). Here, the circuit court found that successor liability passed from AAA to Sportco and Sport Systems, *see supra* Figure 1, transfers #1 and #2, and subsequently to Playmark and Pro Rec. *See supra* Figure 1, transfers #3 and #4. Because successor liability is a mixed question of law and fact, with a "heavier factual component," we review the circuit court's findings for clear error only. *Martin v. TWP Enters., Inc.*, 227 Md. App. 33, 49 (2016). Finding none, we affirm.

A.     Transfer # 1: From AAA to Sportco

In 2005, Jones and Rodowsky split all of AAA's assets between the two new LLCs they created, Sportco and Sport Systems. *See supra* Figure 1, transfers #1 and #2. Sportco received, among other things, AAA's physical assets such as trucks and other equipment. *Id.,* transfer #1. AAA subsequently merged with and into Sportco. By statute, "[a] corporation or other entity surviving a merger" is a "successor," CA § 1-101(dd)(2); and "[t]he successor [in a merger] is liable for all the debts and obligations of each nonsurviving [entity]." CA § 3-114(f)(1); *see also Martin*, 227 Md. App. at 51. Thus, as the "entity surviving a merger" with AAA, Sportco was liable for the debts and obligations of the nonsurviving entity, AAA. *See also Balt. Luggage Co.*, 80 Md. App. at 290 (identifying an exception to the general rule of successor nonliability when the transaction amounts to a merger). Because no one disputes this, we need not address this transfer in any more detail.[7]

B.     Transfer # 2: From AAA to Sport Systems

At the time Jones and Rodowsky divided up AAA, Sport Systems was established to operate the business. *See supra* Figure 1, transfer #2. Although Sportco received AAA's physical assets, we discern from the record that Sport Systems received intangible assets from AAA, including its employees, contracts, clients, and goodwill. At trial, Playmark and Pro Rec conceded that Sport Systems also succeeded AAA and that it had assumed AAA's liabilities:

> THE COURT:     Is anybody in disagreement that [Sport Systems] took over from [AAA]?

---

[7] Perret's complaint also did not name Sportco as a defendant.

9

PRO REC:            No, Your Honor.

Thus, Playmark and Pro Rec each waived any argument to the contrary. Nevertheless, for the following reasons, we conclude that there was sufficient evidence in the record for the circuit court to find that Sport Systems was both a successor to AAA and assumed liability for AAA's obligation to Perret.[8]

### 1.    *Successorship*

As stated above, a transferee in a transfer of "all or substantially all of the assets of a corporation" is a corporate successor. CA § 1-101(dd), (ee). Notably, the "assets" of a corporation include not only tangible assets such as real or personal property, but also its intangible assets such as goodwill. CA § 1-101(d). After Jones and Rodowsky divided Sportco and Sport Systems, the resulting companies continued to operate together. Sportco leased trucks and other equipment to its only customer, Sport Systems, which entered into and carried out contracts, just as AAA had. Sport Systems also began employing Perret and AAA's other employees. Sport Systems was also, therefore, a transferee in a transfer of "substantially all of [AAA's] assets." As such, Sport Systems, too, is, by statutory definition, a successor to AAA.

---

[8] Given that the parties conceded this point at trial, the circuit court did not make an express finding on this point in its oral ruling. In the written order, however, the circuit court found that the EMA "was subsequently assumed by Sport Systems, LLC." It is this finding that we review and affirm here.

2.      *Liability*

Sport Systems did not expressly assume liability for AAA's obligation to Perret, but there is ample evidence in the record to support a finding that Sport Systems' conduct constituted an implied assumption of liability. *Balt. Luggage Co.*, 80 Md. App. at 290. In determining whether there was an implied assumption of liability, Maryland courts look to several factors, including (1) whether the successor received or attempted to receive the direct and substantial benefits of the contract; (2) whether the successor represented to the party asserting liability that it would assume the obligations of the contract; and (3) the circumstances under which such conduct occurred. *Id.* at 294-96; *see also Isle of Thye Land Co. v. Whisman*, 262 Md. 682, 706-07 (1971) (first recognizing an implied assumption of liability). The record is full of evidence from which the circuit court could draw conclusions on all three factors. *First*, Sport Systems undoubtedly received the direct and substantial benefits of the EMA—namely assurance of his long-term employment with the company and Perret's agreement not to compete. Perret, in fact, exceeded the terms of the EMA by continuing to work for Sport Systems for three years longer than the EMA required. *Second*, by making payments pursuant to the EMA for the first four years (2015-2018), Sport Systems represented to Perret that it had assumed the obligation of the EMA. In addition to the payments themselves, both Jones and Rodowsky assured Perret by e-mail[9] and the 2018 Rowan Letter that the EMA was still in effect, even after AAA

---

[9] *See* E-mail from Tilford Jones to James Perret (Feb. 19, 2014, 2:35 p.m.) ("This email confirms that [your] Management Agreement (i.e. us paying you $25K per year for ten years) is not null and void because you are now in sales"); E-mail from Sarah Rodowsky

11

ceased to exist and Perret was employed by Sport Systems. *Third*, the circumstances under which Sport Systems undertook these actions—namely that AAA, the original signatory to the EMA, no longer existed, and that Sport Systems, not AAA, employed Perret from 2005 onwards—further confirm that Sport Systems, by its conduct, impliedly assumed liability for AAA's obligation to Perret.

### 3.     *Conclusion*

Because Sport Systems was a successor to AAA and because Sport Systems impliedly assumed liability for AAA's obligation to Perret, we conclude that the circuit court did not err in finding that Sport Systems bears successor liability for the obligations of AAA.

### C.     Transfer # 3: From Sportco to Playmark and Pro Rec

In 2017, Jones and Rodowsky began planning to split their shared interests in Sportco and Sport Systems into two new companies, Playmark and Pro Rec. *See supra* Figure 1, transfers #3 and #4. Perhaps because Sportco was not a party to the action, or because Sport Systems had so clearly assumed AAA's liability to Perret, the circuit court opted not to trace successorship and liability from Sportco to Playmark and Pro Rec. *Id.*, transfer #3. We will not spend time on this point either, except to say that the explanation for transfer #4 below applies equally to transfer #3.

---

to James Perret (July 6, 2016, 3:14 p.m.) (confirming that Perret's EMA was still in place in 2016).

D.      Transfer # 4: From Sport Systems to Playmark and Pro Rec

Our next step is to determine whether liability passed from Sport Systems to Playmark and Pro Rec when Jones and Rodowsky divided up their interests in Sport Systems. *See supra* Figure 1, transfer # 4. Because we conclude in the following sections both that Playmark and Pro Rec are successors to Sport Systems and that the two entities assumed Sport Systems' liability to pay Perret, we affirm the circuit court.

*1.      Successorship*

Under CA § 1-101(dd), "successor" is defined, in part, as "[a] vendee, lessee, or other transferee in a transfer of assets." "Transfer of assets" is subsequently defined as "to sell, lease, exchange, or otherwise transfer all or substantially all of the assets of a corporation." CA § 1-101(ee). Read together, the statutory requirement to qualify as a successor is that "all or substantially all of the assets" are transferred *from* the predecessor corporation, not that "all or substantially all of the assets" are transferred *to* a particular transferee. Here, the parties agree that "the undisputed evidence was that assets of Sport Systems … were divided between [Pro Rec] and Playmark." Although there is no specific evidence of what Sport Systems was left with, the circuit court found that the transferred assets constituted "the bulk of the business." In light of testimony, the BMA executed by Jones and Rodowsky, and the 2018 Rowan Letter, we discern this to mean that "all or substantially all of the assets" were transferred out of Sport Systems and into Playmark and

13

Pro Rec.[10] As "transferee[s] in a transfer of assets," Playmark and Pro Rec both, therefore, meet the statutory definition of "successor."

Despite this, however, Playmark and Pro Rec make two arguments hoping to escape this conclusion.

*First*, they argue that they cannot be considered successors to Sport Systems because Sport Systems "has never been sold and remains a viable Maryland limited liability company." The circuit court rejected this argument, finding that "[t]he fact that Sport Systems LLC is still in existence doesn't change that the bulk of the business that it conducted was divided between Playmark and Pro Recreation." There is no clear error in this finding. Perhaps Sport Systems still exists, but this doesn't change the fact that Jones and Rodowsky stripped it of its assets. What matters in this analysis is whether "all or substantially all of [Sport Systems'] assets" have been transferred, not whether the corporation technically still exists. Moreover, even if this did matter, there was substantial evidence in the record that the entity is functionally defunct. For example, Rodowsky testified that although Sport Systems was still in existence, it did not operate on a day-to-day basis anymore and that "[t]here [wouldn't] be a tax return filed for Sport Systems for 2019." By contrast, the only evidence in the record that Sport Systems continues to function was testimony that Sport Systems was a plaintiff in other litigation

---

[10] We further note that although there is no evidence in the record that Sport Systems was actually rendered insolvent by the transfer of assets to Playmark and Pro Rec, if, by stripping Sport Systems of its assets, Jones and Rodowsky left it with insufficient assets to pay its liability to Perret, the transfer would be a fraudulent conveyance, and subject to recovery. MD. CODE, COMMERCIAL LAW ("CL") § 15-204.

14

to collect unpaid fees.[11] Given this evidence, it seems clear that Sport Systems was not only stripped of its assets but was no longer even a functioning corporate entity.

*Second*, Playmark and Pro Rec argue that because "the assets were in fact divided equally between [the two new entities], neither could be held to be a transferee of substantially all of the assets …." (emphasis in original). In effect, Playmark and Pro Rec argue that because each company received 50% of Sport Systems' assets, neither received 51%, which they take to be the minimum necessary to qualify as "substantially all of the assets." As we have explained, the requirement here is that "all or substantially all of the assets" are transferred *from* the predecessor corporation, not that "all or substantially all of the assets" are transferred *to* any given transferee. Nothing in the plain language of the statute limits to whom and in what amounts the assets are distributed, and Playmark and Pro Rec cite no authority to support their argument to the contrary.[12] We decline to add an additional requirement that is not in the statute.

Moreover, Playmark and Pro Rec's theory would undermine an important policy goal that animates successor liability—to protect the rights of creditors whenever there is a transfer of assets. *Balt. Luggage Co.*, 80 Md. App. at 297. Notably, the law requires that we weigh this policy consideration "against the equally important policy respecting

---

[11] As Perret correctly points out, participating in a lawsuit can be an act of winding up, which in and of itself does not prove continuity of business. *See* CA § 9A-803(c); § 4A-904.

[12] Playmark and Pro Rec are right that how much a transferee receives in assets can be relevant, but this fact is more appropriately considered when determining whether a given successor assumed liability for a predecessor's obligations, as we do below, not in determining whether a transferee meets the statutory definition of a "successor."

15

separate corporate entities." 15 *Fletcher Cyc. Corp.* § 7122 (2021). Although Playmark and Pro Rec's proposed theory would surely advance the policy of respecting separate corporate entities, it would go too far in that direction, ignoring the need to protect creditors. Were we to adopt Playmark and Pro Rec's position—that successor liability could be avoided simply by ensuring that no *one* corporation received "substantially all of the assets"—corporate liability could easily be avoided. If the assets of a hypothetical corporation were divided into thirds among three new corporations, or divided into fourths among four new corporations, under this theory, there could be no single "successor," and thus no entity would be liable for the predecessor's obligations. This doesn't make sense, and we find no error in the circuit court's rejection of this argument.

Having determined that Playmark and Pro Rec were both transferees in a transfer of all or substantially all of Sport Systems' assets and having rejected both of Playmark and Pro Rec's theories of escaping this conclusion, we affirm the circuit court's finding that Playmark and Pro Rec are successors to Sport Systems.

### 2. *Liability*

The next and last question is whether Playmark and Pro Rec, as successors of Sport Systems, assumed liability for Sport Systems' obligation to Perret. One way a corporate successor can become liable for the obligations of its predecessor, regardless of how much of its predecessor's assets it received, is if "there is an express[ ] … assumption of liability." *Balt. Luggage Co.*, 80 Md. App. at 290. Here, Playmark and Pro Rec received half of Sport Systems' assets, but the circuit court found that statements made on behalf of both Playmark and Pro Rec constituted an express assumption of liability. Playmark and Pro

16

Rec argue that this finding "was contrary to fact and law." Under the clear error standard, we "give due regard to the opportunity of the trial court to judge the credibility of the witnesses," MD. R. 8-131(c), and we are bound by the circuit court's findings of fact unless they are clearly erroneous. *Cunningham v. Feinberg*, 441 Md. 310, 322 (2015).

Here, the circuit court relied upon language in (1) the BMA between Jones and Rodowsky expressly agreeing to pay Perret "$25,000 per year for six years, commencing in 2018, [with] each party's newly formed company [Playmark and Pro Rec] ... bear[ing] one-half the annual cost," and (2) the 2018 Rowan Letter, expressly stating that "Ms. Rodowsky's new business [Playmark] will pay to you 50% of the quarterly payment per the Agreement (or $3,125.00 per quarter) and Mr. Jones' new business [Pro Rec] will similarly pay you $3,125.00 per quarter." Playmark and Pro Rec, however, argue that the circuit court should not have relied on either of these documents for several reasons: because the BMA was merely "entered into prospectively;" because Jones and Rodowsky only considered continuing the payments before they learned of Perret's alleged violations of the non-disclosure agreement; and because the 2018 Rowan Letter was only an offer of settlement, which Perret never accepted. Each of these three arguments, however, is predicated on a contested credibility determination. That is, for the circuit court to have found for Playmark and Pro Rec on any of these theories, it would have had to accept Jones and Rodowsky's characterizations and not Perret's. The circuit court obviously made the

17

opposite credibility determination in each circumstance, believing Perret over Jones and

Rodowsky. We will not disturb these credibility determinations.[13]

Thus, the circuit court did not err in finding that liability passed from Sport Systems

to Playmark and Pro Rec.[14]

E.      Conclusion

Having concluded *both* that Playmark and Pro Rec were successors to AAA, *and*

that they assumed liability for the EMA, we affirm the circuit court's finding that Playmark

---

[13] Playmark and Pro Rec also make a fourth argument that the circuit court committed reversible error by admitting the 2018 Rowan Letter because, as an offer of settlement, it was inadmissible under Maryland Rule 5-408(a). MD. R. 5-408(a) ("The following evidence is not admissible to prove the validity, invalidity, or amount of a civil claim in dispute: (1) Furnishing or offering or promising to furnish a valuable consideration for the purpose of compromising or attempting to compromise the claim or any other claim"). Rule 5-408(a), like its federal counterpart, FRE 408, however, requires that the evidence must relate to a claim "in dispute" to be excluded. "The purpose of Rule 5-408 is to encourage the settlement of lawsuits by ensuring that parties need not fear that their desire to settle pending litigation and their offers to do so will be construed as admissions." *Bittinger v. CSX Transp., Inc.*, 176 Md. App. 262, 276-77 (2007). Where the offer is made before any litigation is pending, or even probable, this purpose is not served, and the protection does not apply. *Burwell v. Easton Mem'l Hosp.*, 83 Md. App. 684, 692 n.2 (1990). Here, the 2018 Rowan Letter was sent before Perret's official date of resignation, more than six months before Playmark and Pro Rec missed a payment to Perret, and ten months before Perret filed his original complaint. Not only was litigation not pending at the time, but none was even probable. There simply was no claim in dispute, as required for Rule 5-408(a) to apply. Therefore, we reject the argument.

[14] In addition to expressly assuming liability, we note that there is also ample evidence in the record to support a finding that Playmark and Pro Rec assumed liability for the EMA impliedly through their conduct or as "mere continuations" of Sport Systems. *Balt. Luggage Co.*, 80 Md. App. at 290. Because the circuit court did not decide on these grounds, we don't discuss them in any more detail here, but suffice it to say that we could affirm the circuit court's judgment on these additional bases. *See City of Frederick v. Pickett*, 392 Md. 411, 424 (2006) (holding that an appellate court can affirm "on any ground adequately shown by the record, whether or not relied upon by the trial court") (internal quotation omitted).

and Pro Rec are contractually obligated to make both the overdue and future EMA payments promised to Perret by their predecessor, AAA.[15]

---

[15] Playmark and Pro Rec advance two additional arguments worth noting here: *first*, that Perret himself breached the EMA and that they were, therefore, relieved of their obligation to pay; and *second*, that Perret failed to prove his damages in accordance with the terms and provisions of the EMA. We reject both arguments.

In the first argument, Playmark and Pro Rec claim that Perret violated the EMA and the incorporated Non-Compete Agreement by referring business to others, sending confidential documents to his home e-mail address, and establishing a gun range while an employee of Sport Systems. Playmark and Pro Rec argue that because Perret breached the contract, he should be prohibited from recovering any damages for their subsequent breach. The circuit court found that "there was no basis for defendants not to pay what was agreed to under the contract." Specifically, the circuit court found that Perret's conduct did not violate the EMA so as to nullify Playmark and Pro Rec's obligations. In so finding, the circuit court made factual findings and credibility determinations, which we review for clear error only. MD. R. 8-131(c). Finding no error, clear or otherwise, we affirm.

The second argument stems from the assertion that Perret was not entitled to the quarterly EMA payments because under the EMA, any successor to AAA would not be obligated to assume duties owed under the agreement. Instead, "[i]n the event [AAA] shall merge or consolidate into or with another corporation, or reorganize, or sell substantially all of its assets to another corporation, firm or person," Perret would, in lieu of the quarterly payments, be entitled to "an amount equal to 2% of the net proceeds of any such sale, merger, consolidation[,] or reorganization of [AAA]." The circuit court found that this provision did not preclude Perret from receiving the quarterly payments because Playmark and Pro Rec "expressly agreed to assume the liability of the $25,000 per year payment." As we have explained, we agree that Playmark and Pro Rec expressly assumed liability and thus agree with the circuit court's conclusion that this provision did not apply here. We further note that the language of the provision—referring to "the *proceeds* of any such sale, merger, consolidation or reorganization" and "*payments* received by the Corporation"—also necessarily implies an exchange of money. There is, however, no evidence in the record that Playmark or Pro Rec paid anything at all for the assets they received. Moreover, "[c]ontractual language between the parties cannot be used to eliminate the requirement and public policy that employees have a right to be compensated for their efforts." *Medex v. McCabe*, 372 Md. 28, 39 (2002). Viewed in this light, it would violate public policy to apply the 2% option to a gratuitous transfer, as to do so would deprive Perret of the right to be compensated for his efforts.

## II. STATUTORY CLAIM UNDER THE WAGE ACT

We turn next to Perret's argument that the circuit court erred in dismissing his claim under the Wage Act. MD. CODE, LABOR AND EMPLOYMENT ("LE") §3-501 *et seq.* The Wage Act is a remedial statute that "protects employees from wrongful withholding of wages by employers upon termination." *Stevenson v. Branch Banking & Trust Corp.*, 159 Md. App. 620, 635 (2004). As such, it is "to be construed liberally in favor of the employee." *Peters v. Early Healthcare Giver, Inc.*, 439 Md. 646, 661 (2014). The Wage Act requires that "each employer shall pay an employee … all *wages* due for work that the employee performed *before the termination of employment*, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." LE § 3-505(a) (emphasis added). The relevant question here is whether the payments promised to Perret under the EMA constitute "wages," subject to the Wage Act. If they do, then Perret may be able to recover not only the missed payments, but up to three times that amount and reasonable attorney's fees and costs. LE § 3-507.2(b). The circuit court found that the payments were not wages and dismissed Perret's claim pre-trial. Because this determination requires both interpretation of a statute (the Wage Act) and a contract (the EMA), it is a question of law, which we review without deference to the circuit court. *Blood v. Columbus US, Inc.*, 237 Md. App. 179, 186-87 (2018). We now reverse.

### A. Definition of a "Wage"

The term "wage" is broadly defined in the Wage Act as "all compensation that is due to an employee for employment [including] (i) a bonus; (ii) a commission; (iii) a fringe benefit; (iv) overtime wages; or (v) any other remuneration promised for service." LE

20

§ 3-501(c). Two leading cases from the Court of Appeals establish the general framework that to constitute a "wage" recoverable under the Wage Act, payments must *both* be promised in exchange for employment *and* fully earned before employment ends. *Whiting-Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 306 (2001) (explaining that the statute should be read to count a payment as a wage "only when it has been promised as part of the compensation for employment"); *Medex*, 372 Md. at 41 ("[A]n employee's right to compensation vests when the employee does everything required to earn the wages"). Three cases from this Court provide more specific guidance when covenants not to compete are involved: *Stevenson*, 159 Md. App. 620; *Aronson & Co. v. Fetridge*, 181 Md. App. 650 (2008); and *Blood*, 237 Md. App. 179.

In the first of these cases, *Stevenson v. Branch Banking & Trust, Corp.*, Stevenson alleged that her employer violated the Wage Act by failing to pay termination compensation as promised in her employment contract. *Stevenson*, 159 Md. App. at 624. We held that:

> [T]he scope of [the Wage Act] extends to the type of severance pay that represents deferred compensation for work performed during the employment. Thus, a severance benefit that is based on the length [or] nature of the employee's service, and promised upon termination, may be recoverable under the [Wage Act].

*Id.* at 644. We concluded, however, that the payments promised to Stevenson were not wages and were, therefore, not recoverable under the Wage Act. *Id.* at 645-46. Although the payments were promised as compensation for Stevenson's services as an employee, the employment agreement explicitly conditioned payment on compliance with a

21

post-employment covenant not to compete in an "if, then" fashion. *Id.* at 645 ("If Employee breaches the non-compete provisions in section 4(a) of this Agreement during the period that she is receiving Termination Compensation, Employee will not be entitled to receive any further Termination Compensation") (cleaned up). Thus, Stevenson could not possibly have fully earned the payments before her employment ended. *Id.* at 646; *see also Whiting-Turner*, 366 Md. at 305-06 (concluding that although the employee had been promised a bonus as compensation for service, he had not earned the bonus before his employment ended). As a result, in *Stevenson* we held that the payments were not wages and were not recoverable under the Wage Act. 159 Md. App. at 646.

In the second case, *Aronson & Co. v. Fetridge*, Fetridge's estate alleged that his former employer violated the Wage Act by failing to pay termination compensation as promised in Fetridge's employment contract. 181 Md. App. at 656. Although Fetridge's contract included a post-employment covenant not to compete, as Stevenson's had, the language of Fetridge's contract provided that Fetridge would still be entitled to the payments, even if he violated the covenant not to compete. Instead, Fetridge's employer retained a right to offset the payments by a pre-determined amount in case of violation. *Id.* at 667-68. Thus, we interpreted Fetridge's contract as establishing two independent obligations: one for Aronson to pay Fetridge his termination compensation if Fetridge was involuntarily terminated; and one for Fetridge to pay Aronson pre-determined damages if Fetridge violated the covenant not to compete. *Id.* Concluding that Fetridge's receipt of the termination compensation was not conditioned on his post-employment compliance with

22

the covenant in an "if, then" fashion, we held that the payments were fully earned before termination and, thus, constituted wages recoverable under the Wage Act. *Id.* at 668.

In the third case, *Blood v. Columbus US, Inc.*, Blood alleged that his former employer violated the Wage Act when the employer terminated his employment and failed to make payments as agreed in his managerial contract. 237 Md. App. at 184. In *Blood*, as in *Stevenson*, the language of the employment contract expressly stated that payment was exclusively "in exchange for" Blood's compliance with a post-employment covenant not to compete. *Id.* at 182-83 ("*In exchange for* clause 10.1 [the covenant not to compete], the Company shall pay remunerations"). As in *Aronson*, however, Blood's contract also included a liquidated damages provision, requiring Blood to pay a preset amount for each violation of the covenant not to compete. *Id.* at 183. Distinguishing the case from *Aronson*, we explained that if compensation is made conditional on a post-employment obligation, it isn't considered "wages" for purposes of the Wage Act, regardless of whether another provision, such as a liquidated damages provision, provides for some form of contractual payment. *Id.* at 192-93. Consequently, we concluded that the payments were not promised to Blood in exchange for employment and, thus, were not wages recoverable under the Wage Act. *Id.* at 193.

Thus, these three cases stand together for the proposition that the mere inclusion of a covenant not to compete does not automatically remove post-employment payments from the realm of "wages" and the scope of the Wage Act if those benefits are (1) promised in exchange for employment, and (2) not expressly conditioned on continuing compliance with the covenant not to compete post-employment.

23

B.    Application to the EMA

We turn, therefore, to the EMA, to determine whether the payments promised to Perret therein satisfy the two-part requirement to constitute "wages" under the Wage Act: (1) whether they were promised in exchange for Perret's employment with AAA and its successors, and (2) whether Perret's right to the payments was expressly conditioned on his compliance with the Non-Compete Agreement after his employment ended. Maryland courts apply the objective theory of contracts, under which we must consider the plain language of the EMA in the context of "not only the text of the entire contract but also the contract's character, purpose, and the facts and circumstances of the parties at the time of execution." *Credible Behavioral Health, Inc. v. Johnson*, 466 Md. 380, 394 (2019) (internal citations omitted).

Signed in 2000 by Perret and Jones (as President of AAA), the EMA includes *both* language promising payment in exchange for long-term employment *and* language limiting Perret's ability to compete with his employer. On the one hand, the EMA states explicitly that its purpose is to secure Perret's ongoing employment:

> B.    The experience of the Employee and his knowledge of the affairs of the Corporation are so valuable that assurance of his continued services is in the best interests of the Corporation. Accordingly, the Corporation desires to provide a financial incentive to reasonably assure his long term employment.

> C.    The corporation desires that the Employee's services be retained as herein provided.

> D.    The Employee is willing to continue in the employment of the Corporation provided the Corporation agrees to pay him or his beneficiaries certain benefits in

24

accordance with the terms and conditions hereinafter set forth.

Specifically, the EMA provides that if Perret continued to work in a managerial capacity from 2000 to 2015, then AAA would pay Perret $250,000 in retirement benefits over the course of 10 years:

> If the Employee shall continue in a managerial position of the Corporation from January 1, 2000 through at least January 1, 2015, the Corporation agrees to pay to the Employee the sum of $25,000.00 annually beginning on January 1, 2015 and continuing for a period of ten consecutive years. For a total payment of $250,000.00.

The EMA also has language limiting Perret's ability to compete with his employer during employment and incorporates by reference the Non-Compete Agreement signed in 1998:

> Employee's on-going employment shall be in accordance with Employee Non-Compete and Confidentiality Agreement executed February 4, 1998 and attached hereto as Exhibit "B." Any violation of this Agreement during or within three years after termination of employment shall nullify the Corporation's obligations set forth herein.[16]

Relying heavily on our decision in *Blood*, the circuit court determined that this language expressly conditioned Perret's right to the EMA payments on his compliance with

---

[16] The EMA also includes a provision requiring Perret to make himself available to render consulting services as needed after the conclusion of his employment:

> It is mutually agreed that following retirement from active daily employment, the Employee shall, at the request of the Corporation, be available at reasonable times and places as may be mutually agreed upon, to render services to the senior executives of the Corporation at its offices in an advisory or consulting capacity.

*       *       *

25

the covenant not to compete post-employment. Consequently, the circuit court concluded that, as in *Stevenson* and *Blood*, Perret could not have fully earned the payments before his employment ended, and, therefore, that the payments were not "wages" subject to the Wage Act. We interpret the language of the EMA differently. We hold that the EMA payments constitute "wages," as they were (1) promised in exchange for employment, and (2) fully earned before Perret's employment ended.

*First*, the EMA expressly states that its purpose is "to provide a financial incentive to reasonably assure [Perret's] long term employment" with AAA, as was the case in *Aronson*, 181 Md. App. at 671-72. Unlike the agreements in *Stevenson* and *Blood*, the EMA explicitly ties the $250,000 to Perret's continued employment in a managerial capacity for fifteen years in an "if, then" fashion. Thus, like *Aronson* and unlike *Stevenson* and *Blood*, Perret's payments were promised as part of his compensation for employment.

*Second*, Perret earned the right to the EMA payments when he fulfilled the required fifteen-year term. Unlike in *Stevenson*, 159 Md. App. at 645, this right was not expressly conditioned on Perret's compliance with the Non-Compete Agreement. As in *Aronson* and *Blood*, Perret's Non-Compete Agreement has its own liquidated damages for various breaches. For example, the Non-Compete Agreement states:

---

> In consideration for such consulting services, the Corporation shall pay the Employee reasonable compensation for the services rendered.

Playmark and Pro Rec argue that this provision conditions the payments on another post-employment obligation. We hold, however, that because the EMA specifies that separate consideration will be paid to Perret for the actual work of consulting, the payments at issue in this litigation were not tied to the post-employment consulting obligation.

> The employee hereby agrees and covenants, that if he commits any act in violation of Sections 2 or 3 with respect to any tennis court(s), game court(s), game areas[,] or fields, he shall pay SSI, in cash, a sum equivalent to 25% of the sales price of each and every such job resulting from or relating to such act…

Without explicit language tying payments to the Non-Compete Agreement, the EMA is much more like the agreement in *Aronson* than like the one in *Blood*. As in *Aronson*, the EMA lays out two, separate and independent obligations: one for AAA to pay Perret the $250,000 if he remained employed in a managerial capacity for fifteen years; and another for Perret to comply with the terms of the Non-Compete Agreement or risk paying the liquidated damages described therein.

Playmark and Pro Rec's argument that the payments were conditioned on post-employment compliance with the Non-Compete Agreement is based on an incorrect reading of the term, "this Agreement," in the relevant provision of the EMA: "Any violation of *this Agreement* during or within three years after termination of employment shall nullify the Corporation's obligations set forth herein." (emphasis added). Playmark and Pro Rec interpret "this Agreement" to refer to the Non-Compete Agreement, consequently creating an "if, then" condition, like in *Stevenson*, 159 Md. App. at 645. The correct reading of the EMA, however, is that the term, "this Agreement," as used here, refers to the EMA itself, not the Non-Compete Agreement. As evidence of this, we note that the term, "this Agreement," is used a total of twenty times throughout the EMA, both before and after the incorporation of the Non-Compete Agreement. Although it is not expressly defined anywhere, each of the other nineteen times the term is used, it clearly

27

refers only to the EMA. We see no reason to presume that the same term refers to a different agreement entirely in the clause at issue here. When read this way, it is clear that the penalties for violating the Non-Compete Agreement are the specific liquidated damages laid out in the Non-Compete Agreement itself, not nullification of AAA's obligation to pay Perret. Thus, Perret's right to the EMA payments was not conditioned on a post-termination obligation not to compete, and he did everything necessary to earn the payments when he fulfilled the required fifteen-year term.

Having determined *both* that the EMA payments were promised as part of Perret's compensation for employment *and* that Perret did everything necessary to earn the payments before his employment ended, we hold that the EMA payments are wages, subject to recovery under the Wage Act, and that the circuit court erred as a matter of law in dismissing the claim.

### C.    Further Proceedings

We must next address how much, if anything, Perret can recover in addition to the $250,000 already accounted for under the breach of contract judgment. Section 3-507(b) of the Wage Act permits an employee to recover up to three times the wage owed (which we refer to here as "enhanced damages") and reasonable attorney's fees and other costs if the employer's failure to pay the money owed was "not as a result of a bona fide dispute." LE § 3-507(b). Because the circuit court dismissed this claim, it did not reach the relevant questions of fact: (1) whether Playmark and Pro Rec's failure to make payments was the "result of a bona fide dispute;" (2) if not, how much (if anything) Perret is entitled to recover in enhanced damages, attorney's fees, and costs; and (3) whether Jones and

28

Rodowsky should also be held personally liable for that amount. These are questions, in the first instance, for a trier of fact,[17] not an appellate court. *Admiral Mortg., Inc. v. Cooper,* 357 Md. 533, 544 (2000).

For these reasons, the judgment of the circuit court dismissing Perret's claim under the Wage Act is reversed. The case is remanded to the circuit court to enter judgment in favor of Perret, and to conduct any further proceedings necessary to determine appropriate damages, costs, and fees.[18]

## CONCLUSION

We hold that Playmark and Pro Rec, as successors to AAA, are contractually obligated to pay Perret under the EMA. We, therefore, affirm the circuit court's judgment

---

[17] Ordinarily, determinations about whether withholding an employee's wages was the result of a bona fide dispute and whether to award enhanced damages are questions for the jury, while determinations about attorney's fees and costs are questions for the judge. *Admiral Mortg., Inc. v. Cooper*, 357 Md. 533, 544, 553 (2000). Here, however, the EMA, by its terms, waives the parties' right to a jury trial, and thus all questions must be resolved by the judge, as the sole trier of fact.

[18] In so doing, we caution that any additional recovery may well be limited. First, to recover any enhanced damages, costs, or fees, Perret must prove that Playmark and Pro Rec did not withhold the payments as a result of a bona fide dispute—in other words that there was no "legitimate dispute over the validity of [his] claim"—which may be difficult in light of this litigation. *Peters*, 439 Md. at 657 (quoting *Admiral Mortg.*, 357 Md. at 543). Second, even if Perret can prove that there was no bona fide dispute, he has already recovered the wages themselves under his breach of contract claim and cannot recover the same damages twice. *Programmers' Consortium, Inc. v. Clark*, 180 Md. App. 506, 516 (2008); *see also Peters*, 439 Md. at 667 (explaining that the total amount recoverable under the statute is three times the unpaid wage, not three times the unpaid wage *in addition to* the unpaid wages). Recovery of enhanced damages, attorney's fees, and costs is not guaranteed but rather left to the discretion of the trier of fact. *Admiral Mortg.*, 357 Md. at 551; *but see Friolo v. Frankel*, 373 Md. 501, 518 (2003) (encouraging courts to exercise their discretion liberally in favor of awarding reasonable attorney's fees). Moreover, to hold Jones and Rodowsky liable in their personal capacities, Perret must also show that,

for breach of contract against Playmark and Pro Rec for the overdue payments as well as the circuit court's declaration that Playmark and Pro Rec are responsible for the remaining future payments to Perret. We also hold, however, that Playmark and Pro Rec's failure to pay Perret was a violation of their statutory obligation to him under the Wage Act. In addition to the missed payments themselves, Perret may, therefore, also be entitled to recover enhanced damages, attorney's fees, and costs. We consequently reverse the circuit court's judgment regarding the Wage Act and remand for further proceedings.[19]

> **JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLANTS, PLAYMARK AND PRO RECREATION.**

---

under the totality of the circumstances, they maintained sufficient control over him to constitute "employers" under the statute. *Pinnacle Grp., LLC v. Kelly*, 235 Md. App. 436, 472-73 (2018) (explaining the four-factor, economic reality test).

[19] Playmark and Pro Rec assert one final argument regarding their shared liability: that the circuit court erred in imposing joint and several liability on them because the documents on which the circuit court relied to find that Playmark and Pro Rec assumed liability for the payments—the BMA and the 2018 Rowan Letter—expressly state that Playmark and Pro Rec would each be responsible for half of the annual payments. This misunderstands the role of these documents in the analysis. They aren't functioning as new contracts but rather provide evidence that Playmark and Pro Rec assumed AAA's liability to Perret. The EMA remains the sole contract and, as we held above, Playmark and Pro Rec both bear successor liability to Perret on the EMA. Of course, if Perret enforces the judgment against only one of those companies, that company may bring a contribution claim against the other company and rely on these documents.

30